STATE OF CONNECTICUT *v.* ROBERT JENKINS
(AC 20849)

Schaller, Mihalakos and Dupont, Js.

Argued June 12—officially released October 22, 2002

*Adele V. Patterson,* assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Rosita M. Creamer,* senior assistant state's attorney, for the appellee (state).

DUPONT, J. The defendant, Robert Jenkins, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1)[1] and risk of injury to a child in violation of General Statutes § 53-21.[2] The defendant did not deny that he had inflicted the injuries that caused the child's death. The principal contested issue at trial was the intent of the defendant when he struck the child. On appeal, the defendant seeks a new trial, claiming that the trial court improperly (1) allowed the state access to and use of his privileged mental health records and (2) denied him a fair trial by giving the jury an instruction to disregard any evidence of the defendant's alleged intoxication if it did not negate the element of intent.[3]

The jury reasonably could have found the following facts. The defendant lived with his girlfriend, Lisa Pettiford, and her three children, including the victim, in an apartment in Hartford. The victim was the youngest of the three children and was twenty-three months old at the time of his death. On February 9, 1996, the defendant arrived home in the morning after consuming heroin, cocaine and marijuana the previous evening and earlier that morning. The defendant continued to consume nar-

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

[2] The defendant's brief does not seek a reversal of the conviction of risk of injury to a child in violation of General Statutes § 53-21, and that conviction remains undisturbed.

The defendant also had been charged with capital felony for the "murder of a person under sixteen years of age"; General Statutes § 53a-54b (9); but was found not guilty of that charge.

[3] We do not reach the issue relating to the alleged impropriety in the court's charge to the jury because of our disposition of the first issue, which requires a new trial that will involve a new charge.

cotics and fell asleep on the couch. At some point in the late morning, Pettiford placed the victim in the defendant's care and went to a bake sale at the community center near the apartment complex.

Shortly before 2 p.m., the defendant came running into the community center screaming for help with the victim in his arms. Blood was observed coming from the victim's nose and mouth, and the defendant's shirt was full of blood. The defendant told Pettiford that the victim had fallen down the stairs. The director of the community center called for emergency assistance, and police, paramedics and fire personnel responded to the scene. The paramedics observed that the victim was not breathing, had no blood pressure, but appeared to have a pulse, and they observed that there "was quite a bit of trauma to the [victim's] head and face." The defendant told the emergency personnel that the victim had suffered the injuries when he fell down stairs.

The victim was transferred to Hartford Hospital and was in full cardiac arrest when he arrived at approximately 2:20 p.m. Medical personnel were successful in resuscitating his heartbeat at the hospital, but the victim exhibited no brain function. On February 10, 1996, at approximately 6 p.m., the victim was declared to be brain dead.

On February 12, 1996, Detective James Rovella of the Hartford police department advised the defendant that he was going to be arrested on charges of murder and tampering with evidence. The defendant agreed to talk to Rovella concerning the incident and waived his *Miranda*[4] rights. In a written statement the defendant gave to the police, he admitted that he had hit the victim.

The defendant's written statement included the following. The defendant had consumed two bags of her-

---

[4] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

oin in the morning and was sleepy. He was sitting on the couch and expected the victim to fall asleep. On two occasions, the defendant fell asleep and woke up startled because the victim was not around. On both occasions, the defendant found the victim and "popped [the victim] on his hand." On the second occasion, the defendant also "popped [the victim] in the head twice with the belt.[5] [The victim] cried a lot more this time. I grabbed him by his hand and walked him back to the living room. When we got back to the living room I hit him twice in the head with the remote control for the [television] and told him he better sit down and stay down. [The victim] was crying. I laid back on the couch. I faked like I was going to sleep to see if he was going to move again. I closed my eyes just so I could see a little. [The victim] got up like he was going to get something. I got up and grabbed him and punched him [in] the chest and told him he better sit down. After I punched him in the chest it seemed like all the air went out of him because he made this noise. [The victim] fell backwards and he hit his head on the shelving unit where the [television] is. [The victim] just laid there and he wasn't crying or doing anything." The defendant then described how he took the victim to the bathroom and tried to revive him. He then grabbed their coats and went to the community center where the victim's mother was located.

The victim's treating physician, Betty Spivack, testified that the injuries "were typical of multiple blows to the head coming from different directions striking different parts of the head. That is not typical of acciden-

---

[5] The defendant claimed that the belt he used to hit the victim did not contain a buckle. The belt admitted at trial did not contain a buckle. There was evidence presented at trial that some of the victim's injuries could be consistent with a buckle from a belt, and it was the state's theory that the defendant disposed of the buckle before taking the victim to the community center.

tal injury such as a fall down stairs. This is, however, very typical of assaultive injuries."

On February 11, 1996, the chief medical examiner for the state of Connecticut, Harold Wayne Carver II, conducted an autopsy on the victim's body. Carver concluded that the victim "died as a result of blunt traumatic head injury" and classified "the manner of death as homicide."

During the trial, the state introduced the defendant's written statement into evidence during its case-in-chief. Part of that statement read: "I have a heroin problem. Usually I would get a stack of bundles of heroin fronted to me. I would sell 55 bags for $500.00 and then pay back the guy who fronted me. That would leave me with 45 bags profit. I would spend the money I made for the 45 bags on myself and the stuff for the house. Lisa [Pettiford] knew about my habit. I sniffed 2 to 3 bundles of heroin a day but I know what I was doing when I sniffed the heroin. A bundle is ten bags. Sometimes I would fall asleep but I knew what was going on."

When the state rested its case-in-chief, the defendant informed the court that he would be requesting an instruction on intoxication on the basis of his illegal drug use. Subsequently, the state's attorney advised the court that she had subpoenaed some department of correction records, which the state claimed were relevant to determine whether the defendant suffered from withdrawal symptoms. The absence of withdrawal symptoms would presumably rebut the defense that the defendant was intoxicated at the time of the injuries to the child. The state also cited as a reason for requesting the records that the defendant's attorney had indicated that the defendant would be testifying and that, therefore, the issue of drug use was relevant.

Later that day, the court asked the defendant if it could view the records in camera to address the state's

concerns and stated that "anything I read will be in confidence." The defendant gave the court permission to review the records, including the mental health records, in camera to determine "what the state may receive."

The defendant was scheduled to take the witness stand to testify on the next court date. Before the defendant took the witness stand, the court noted that it had reviewed the prison records in camera and stated: "The court has examined them and finds at this point, with the exception of a reference to one or two matters that are probably privileged, finds nothing that would preclude the state from examining the records. Now, having said that, however, the court is going to request of the prosecutor that if the medical records are to be used, portions of them, in cross-examination, that we have a recess between the direct examination and the cross-examination so that the court can hear in limine which matters the prosecution wants to address." The state's attorney then asked that the portions of the file that are privileged be redacted. The court reiterated its ruling that the state review with the court those portions it would like to use on cross-examination before the state would be allowed to proceed. The court did not order any portion of the record to be redacted and did not specify what "one or two matters" were "probably privileged." Immediately thereafter, the state and the defendant were both provided a full copy of the records.

That same day, the defendant testified that he had used heroin, cocaine and marijuana in the months before the victim's death. He further testified that he had used approximately twenty to thirty bags of heroin a day on average, which was consistent with his written statement. The defendant testified that on the night of February 8, 1996, he had used approximately fifteen bags of heroin along with cocaine and marijuana, and

that on the morning of February 9, 1996, he had used an additional three bags of heroin.

After reviewing the department of correction records that had been disclosed and given to the parties that morning, the defendant sought to seal the records concerning his mental health. The defendant asserted that approximately fifteen of the pages were privileged mental health records "for the purpose of counseling and treatment," and objected to the use of any portion of the fifteen pages, which were marked as "exhibit M" for identification. The exhibit is the defendant's entire mental health record received from the department of correction.

The cover sheet of exhibit M is labeled "Mental Health Initial Assessment" and is dated July 30, 1996. It contains basic statistics about the defendant, a summary of the defendant's mental health history, psychoactive medication history, marital status and other biographical information. The fifteenth sheet contains the defendant's signed consent to be admitted to the mental health unit for mental health assessment and treatment. The interior sheets of exhibit M contain details of the defendant's relationship with his family, a mental health treatment plan, a mental status evaluation and clinical records spanning February 13, 1996, through October 30, 1996.

The state told the court that it intended during cross-examination to use one page out of the fifteen pages that the defendant was claiming were privileged.[6] The page was the fourteenth page of exhibit M and was

[6] The state agrees that the other pages of exhibit M were mental health records in accordance with General Statutes § 52-146d and, therefore, would be privileged pursuant to General Statutes § 52-146c. The state argues that although it received the entire unredacted fifteen pages, the other pages were not utilized by the state in cross-examination. The state limits its claim for use of the material to the page entitled "In-Patient Mental Health Nursing Assessment."

entitled "In-Patient Mental Health Nursing Assessment" (nursing assessment). The state claimed that the page did not meet the statutory requirement of being a communication with a psychiatrist or member of his staff for the purpose of diagnosis or treatment. The state further argued that it would use the document only to impeach the defendant's credibility and challenge his defense of intoxication. The state argued that "there's a nursing assessment, and it includes an interview with the defendant in which he's specifically asked about the history of substance abuse, and he gives an amount that's inconsistent with what he's testified to. . . . I don't believe that just because the defendant got himself on a mental health unit . . . he should be shielded from that inconsistent statement that he made with respect to his drug use."

The nursing assessment is dated February 13, 1996. It contains abbreviated information about the defendant's use of drugs since 1985, including "yes" or "no" answers to history of withdrawal symptoms and the presence of withdrawal symptoms. The history of drug use is in close proximity to the information concerning withdrawal symptoms. It would be difficult to read about the withdrawal symptoms without also reading the history of the defendant's drug use.

The court concluded that "in view of [the defendant's] testimony on direct examination as to his volume of heroin consumption, I will permit that." The defendant reiterated his objection pursuant to the statutory privilege between a psychiatrist and a patient, noting that the nurse who conducted the interview was under the supervision of a psychiatrist.

The defendant then requested a brief recess to subpoena the supervisor of the mental health unit to establish that the interview was for the purpose of mental health treatment. The court stated: "I'm not going to

grant any recess. I'm going to bring the jury out. Let's go. . . . If you want to subpoena [the supervisor] . . . and we can squeeze him in [next week], we'll do so."[7] The defendant responded that it would be too late at that time, and the jury would have already heard the state's cross-examination of the defendant.

The direct examination of the defendant then continued. During cross-examination of the defendant, the state inquired as to the statement given during the mental health interview that was inconsistent with his written statement and his direct testimony. The defendant answered that the nursing assessment was a mistake and that he did consume twenty to thirty bags of heroin a day, rather than two to three bags a day as indicated on the nursing assessment.

During the defendant's redirect testimony and during the recross-examination, the defendant's inconsistent statement was the *only* topic addressed. The defendant reiterated that he consumed twenty to thirty bags of heroin a day. The testimony concerning the inconsistent statement consisted of six pages during cross-examination, redirect and recross examination.[8]

On May 5, 2000, the court heard oral arguments concerning the defendant's motions for a judgment of acquittal and for a new trial.[9] In support of the motions, the defendant called Bret Rayford, the director of

[7] The director of health, mental health and addiction services for the department of correction services was, in fact, subpoenaed and testified, after the trial had concluded, which testimony is discussed.

[8] The jury during its deliberations asked to have read to it the entire testimony of the defendant. That was done, with the court noting that the reading took two and one-half hours. A good portion of direct examination related to the quantity of drug use of the defendant both prior to and at the time of the death of the victim.

[9] The defendant also filed a motion requesting an order concerning his department of correction mental health records, which motion requested that the court seal exhibit M. The state did not object, and the court granted that motion on the same day.

health, mental health and addiction services for the department of correction. Rayford testified that: "These [exhibit M] are mental health records that run from the initial mental health assessment, to include a mental health treatment plan [and] progress notes with documentation from mental health and other psychiatric staff . . . ." Rayford also testified that the nurses and social workers were working under the supervision of a psychiatrist. He reiterated that all of the forms, including the nursing assessment, supplied information and were mental health records, including the biographical data and the former drug use.

The defendant argued that he had not waived the psychiatrist-patient privilege. The defendant further argued that the defense presented at trial was not a defense relating to his mental condition, but to his intoxication at the time the incident occurred, which negated intent. He argued that this was not similar to a defense of insanity. The same day, the defendant's motions for a judgment of acquittal and for a new trial were denied and the defendant was sentenced.

I

On appeal, the defendant claims that the court improperly gave the state access to a mental health record that was produced while the defendant was in the custody of the department of correction in violation of the psychiatrist-patient privilege and in violation of General Statutes §§ 52-146c through 52-146f.[10] Both par-

[10] General Statutes § 52-146d provides in relevant part: "As used in sections 52-146d to 52-146i, inclusive . . .

"(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist . . . or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility;

"(3) 'Consent' means consent given in writing by the patient or his authorized representative . . .

ties agree that Connecticut has a broad psychiatrist-patient privilege which protects confidential communications and records. See *Skakel* v. *Benedict*, 54 Conn. App. 663, 679, 738 A.2d 170 (1999); see also General Statutes § 52-146e (a); C. Tait, Connecticut Evidence (3d Ed. 2001) § 5.46.1, p. 340. The statute must be narrowly construed to protect the privilege, without allowing exceptions not enacted by the legislature. *Falco* v. *Institute of Living*, 254 Conn. 321, 328, 757 A.2d 571 (2000).

The first question that we must address is whether the nursing assessment is a mental health record as defined in General Statutes § 52-146d. This is an issue of statutory interpretation and therefore, our review is plenary. See *Skakel* v. *Benedict*, supra, 54 Conn. App. 675.

The state concedes that there is no dispute that a patient seeking diagnosis or treatment for a substance abuse problem is covered under the same statutory privilege as are those patients with mental conditions. See id., 680. The state, however, argues that there is

"(5) 'Mental health facility' includes any hospital, clinic, ward, psychiatrist's office or other facility, public or private, which provides inpatient or outpatient service, in whole or in part, relating to the diagnosis or treatment of a patient's mental condition;

"(6) 'Patient' means a person who communicates with or is treated by a psychiatrist in diagnosis or treatment;

"(7) 'Psychiatrist' means a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry, or a person reasonably believed by the patient to be so qualified."

General Statutes § 52-146e provides in relevant part: "(a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. . . ."

nothing in the nursing assessment to suggest that the defendant was seeking diagnosis or treatment for *any* mental condition. General Statutes § 52-146d (2) defines communications and records as all oral and written communications and records "relating to diagnosis or treatment of a patient's mental condition . . . ."

The purpose of the privilege is "to protect a therapeutic relationship. The statute provides a privilege for confidential communications so that a patient may safely disclose to his therapist personal information that is necessary for effective treatment or diagnosis." *Bieluch* v. *Bieluch*, 190 Conn. 813, 819, 462 A.2d 1060 (1983); see also *Falco* v. *Institute of Living*, supra, 254 Conn. 328.

The second page of the nursing assessment, page fifteen of exhibit M, is a consent form in which the defendant consents to "mental health assessment and treatment." The first page of the nursing assessment, page fourteen of exhibit M, was used by the state in an attempt to show a prior inconsistent statement. The defendant clearly authorized diagnosis and treatment of a mental condition and the testimony of the director, Rayford, established that the nursing assessment was conducted under the supervision of a psychiatrist. Rayford indicated that exhibit M, including the nursing assessment, is a mental health record. All the information, even the biographical data, is used according to Rayford to "gather information about mental health issues"; see *Falco* v. *Institute of Living*, supra, 254 Conn. 329; and therefore, was privileged by statute.

II

Having concluded that the document entitled "In-Patient Mental Health Nursing Assessment" was, in fact, a mental health record that would be privileged pursuant to §§ 52-146d through 52-146f, we now turn to whether, under the facts of this case, the defendant

waived the psychiatrist-patient privilege by testifying that he was intoxicated as a result of drug use on February 9, 1996. The state argues that the defendant waived the psychiatrist-patient privilege because he placed his mental state in issue when he presented evidence that he was intoxicated, testified that he had a twenty bag to thirty bag a day heroin habit and requested a jury instruction on intoxication.

The state views the issue of this case as being whether the state should have been permitted to impeach the credibility of the defendant by using an allegedly prior inconsistent statement. The defendant views the issue as being whether the state has any right to view and to use a mental health record for impeachment purposes without a written waiver by the defendant. The defendant further argues that his testimony about his drug habit did not impliedly waive his statutory privilege to shield his mental health records from the eyes of the state.

The defendant in this case did not *expressly*, in writing, authorize the release of his mental health records to the state. The state, however, cites *State* v. *Brelsford,* 24 Conn. App. 287, 587 A.2d 1062 (1991), as allowing a conclusion that the defendant *impliedly* waived his privilege because he took the witness stand to assert that he was intoxicated on the day of the infliction of injuries to the victim. In *Brelsford,* the defendant testified that his treating physician had told him what would happen if he failed to take medication and, as a result, the defendant committed the crime of escape from custody to obtain medication. The state used the testimony of the treating physician at the Bridgeport correctional center to rebut that claim. It was the testimony of that witness that the defendant unsuccessfully claimed should not have been allowed. The court reasoned that because the defendant had put in issue his reasons for escape from custody, the crime with which

he was accused, he had impliedly waived the privilege. We do not agree that the case controls.

In the present case, the defendant's claim that he had no intent to commit the crime was not directly related to the prior inconsistent statement because his prior use of heroin was not directly probative of the amount of heroin he claimed to have used on February 9, 1996, nor was his prior use of heroin a central issue in the trial.

In fact, there was no testimony to show that if the defendant consistently had used drugs to excess before or on February 9, 1996, he would have suffered withdrawal symptoms on February 13, 1996, the date of the nursing assessment in exhibit M. Thus, the absence of withdrawal symptoms, which was the reason for the state's request to review the privileged record, may not have been probative of a lack of ingestion of drugs or no intoxication on February 9, 1996. Furthermore, in *Brelsford*, the defendant testified about his privileged communications, thereby breaching the privilege himself. Id., 289.[11]

On the facts of this case, the defendant's constitutional right to assert a defense, that is, his right to testify; *State* v. *DeJesus*, 260 Conn. 466, 481, 797 A.2d 1101 (2002); and his statutory right to keep records of his mental condition confidential can coexist. Not a single page of exhibit M should have been supplied to the state. All of the pages were confidential, and the defendant did not impliedly waive or expressly waive the privilege.

Access to the confidential psychiatric records is left to the discretion of the trial court. *State* v. *Slimskey*, 257 Conn. 842, 856, 779 A.2d 723 (2001). If, however, after an in camera review of the records in question,

---

[11] The defendant in *Brelsford* offered the testimony of a nurse and supervisor of the medical department at the correctional facility, and a clerk who testified as to the defendant's medication.

that discretion is not exercised in conformity with the law or its spirit, or impedes the ends of justice or is determined on untenable grounds, there is an abuse of discretion. *State* v. *Olah*, 60 Conn. App. 350, 354, 759 A.2d 548 (2000); see also *State* v. *Slimskey*, supra, 855–56. Here, the court abused its discretion by releasing *all* of the defendant's mental health records, without redacting any portions that it had determined were privileged, and improperly concluded that the nursing assessment record was not privileged.

### III

Having concluded that it was an abuse of discretion to give the state any of the defendant's mental health records, without redaction of any portion, we must next determine the consequences of that conclusion. Most cases dealing with the access to and use of privileged psychiatric records or waiver of their confidentiality concern their use in the impeachment of a witness, or inquiry into the testimonial reliability of a witness, other than the impeachment of a defendant who wants to exert his constitutional right to testify as a witness at his criminal trial. See *State* v. *Slimskey*, supra, 257 Conn. 842; *State* v. *Joyner*, 225 Conn. 450, 476–79, 625 A.2d 791 (1993); *State* v. *Pierson*, 201 Conn. 211, 218–29, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989); *State* v. *William C.*, 71 Conn. App. 47, 60, 801 A.2d 823 (2002); *State* v. *Francis*, 70 Conn. App. 571, 578–79, 800 A.2d 574, cert. granted on other grounds, 261 Conn. 925, 806 A.2d 1062 (2002); *Skakel* v. *Benedict*, supra, 54 Conn. App. 663.

We are unaware of any case duplicative of this case that balances a defendant's statutory privilege to keep his psychiatric records confidential against the constitutional right of a defendant to testify. In the usual case, it is the *defendant*, not the state, who seeks the confi-

dential records after making a preliminary showing that there are reasonable grounds to believe that the failure to produce the records would likely impair the defendant's right to impeach a witness. In such cases, the state must obtain the witness' permission to inspect the records, which, if not given, will cause the witness' testimony to be stricken. *State* v. *Slimskey*, supra, 257 Conn. 855. If, after an in camera inspection, the court determines that the confidential records are probative, the state must obtain the witness' waiver of his privilege to release the records to the defendant. If the witness refuses to waive the privilege, the witness' testimony will be stricken. Id. If the same rule were applied to a defendant, the defendant would either have to waive his privilege or have his testimony stricken. We know of no case that has applied the usual rule to the testimony of a defendant.

The defendant seeks a new trial because of the court's abuse of discretion in releasing the page from his nursing assessment and because of the release of his entire, unredacted mental health record[12] without an express or implied waiver of his privilege to maintain the record's confidentiality. The usual consequence for a failure of a trial court to release relevant privileged material to the defendant, where the failure was not harmless beyond a reasonable doubt, is a new trial.

[12] Because we hold that the page of the exhibit M in question was privileged and that the privilege was not waived by the defendant when he took the witness stand to assert a defense, we do not reach a broader claim of the defendant. The defendant argues that the very fact of the state's possession of the defendant's entire mental health record, whether or not any information from it was used during the cross-examination of the defendant, provided the state with an improper window into the psychology of the defendant, which would require reversal of his conviction of manslaughter and a new trial. We need not decide whether this case is one where a constitutional protection is so central to the requirement of a fair trial that its violation absolutely requires that the conviction from which it arose be set aside. See *Chapman* v. *California*, 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

*State* v. *Slimskey*, supra, 257 Conn. 861; *State* v. *Olah*, supra, 60 Conn. App. 354–56. In those cases, in which a new trial is granted, the retrial will of necessity involve the possibility that the witness may not be allowed to testify unless the privilege as to any relevant portions of the records being released to the defendant is waived. See *State* v. *Pierson*, supra, 201 Conn. 227.

In those cases that deal with a witness, other than the defendant, the test for determining whether the failure to release a privileged record is harmless or harmful beyond a reasonable doubt contains several factors. These assess the "importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecutor's case." (Internal quotation marks omitted.) *State* v. *Slimskey*, supra, 257 Conn. 859. These factors are ill-suited to test the use of relevant privileged material of the defendant when the defendant has chosen to testify at his trial.

The reason for an exception to the prohibition of use of privileged material when a witness' mental health record is involved is due to a criminal defendant's constitutional right to cross-examine the state's witnesses. That cross-examination may include impeaching or discrediting the state's witnesses by attempting to reveal to the jury their biases or prejudices or facts relating to their credibility or sense of perception. *Delaware* v. *Fensterer*, 474 U.S. 15, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). The state, however, has no *constitutional* right to test a defendant's credibility with his privileged material, although it has a right to test that credibility by other appropriate cross-examination.

We conclude that this case cannot be governed by those cases involving the testimony of persons other

than criminal defendants as to relevant privileged material.[13] We look instead to analogous cases involving such defendants and the attempted use of psychiatric records, obtained through court-ordered evaluations, to impeach defendants during cross-examination. The leading case is *State* v. *Boscarino*, 204 Conn. 714, 734–37, 529 A.2d 1260 (1987), in which it was held that the trial court improperly allowed the state to impeach the credibility of the defendant on cross-examination with an inconsistent statement he had made to a psychiatrist, and, thus, a new trial was ordered. In *Boscarino*, Practice Book § 760, now § 40-19, was the backdrop for the existence of the psychiatric record. *State* v. *Boscarino*, supra, 735–36. That section is a compromise between a defendant's right to avoid self-incrimination and the state's right to present evidence of a mental state of a defendant when the evidence is relevant to an issue at trial. Id., 736. Practice Book § 40-19, formerly § 760, "must be strictly construed to protect the [defendant's] fundamental constitutional right to liberty." (Internal quotation marks omitted.) *State* v. *Boscarino*, supra, 736.

Practice Book § 40-19 provides in relevant part that no statement made by the defendant "in the course of [the court-ordered examination] shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. . . ." The *Boscarino* court

---

[13] We note that the statutory privilege for communications between a psychiatrist and patients grants an exception in General Statutes § 52-146c (c) (2) that specifically allows a nonconsensual use of communications of a person relating to diagnosis and treatment in *civil proceedings* in which "a person introduces his psychological condition as an element of his claim or defense . . . and the judge finds that it is more important to the interests of justice that the communications be disclosed than that the relationship between the person and psychiatrist be protected . . . ." (Emphasis added.) No such nonconsensual use is provided in the case of criminal defendants. That exception, allowing disclosure, is clearly not a legislative invitation to allow disclosure in a criminal case. See *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 195, 663 A.2d 1001 (1995).

determined that the inconsistent statement was introduced on the issue of guilt and, therefore, the error was not " 'irrelevant.' " *State* v. *Boscarino*, supra, 737.

*Boscarino* was cited approvingly in *State* v. *Manfredi*, 213 Conn. 500, 512 n.10, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990), for its holding that the state is prohibited from using information obtained in a court-ordered psychiatric examination to meet its burden of proving the guilt of a defendant. Practice Book § 40-19 must be strictly construed to protect a defendant's constitutional right to liberty. *State* v. *Jarrett*, 218 Conn. 766, 775–76, 591 A.2d 1225 (1991). Even when the records of a witness other than a defendant are reviewed in camera, a general "in camera search through psychiatric records for prior inconsistent statements allegedly made by the witness" is not authorized. *State* v. *Silva*, 201 Conn. 244, 256–57 n.2, 513 A.2d 1202 (1986).

The particular statement in the court-ordered psychiatric record used in *Boscarino* related to the particular time of day the defendant claimed as an alibi for his presence at the crime scene, which implicated the issue of the defendant's guilt. *State* v. *Boscarino*, supra, 204 Conn. 735. The state used the statement to discredit that alibi, although the state claimed it related only to the defendant's credibility in general. Id., 735–36. The privileged statement in the present case related to the defendant's prior drug use, since 1985, but was used to discredit the defendant's claim that he was intoxicated at the time of the victim's death. That claim implicated the issue of the defendant's guilt.

We conclude that *Boscarino* is controlling and that the current case presents an even more compelling reason to order a new trial than the *Boscarino* facts. The inconsistent statement contained in the privileged material used by the state was not relevant to the defen-

dant's claim of intoxication on the day of the death of the victim. It was undisputed that the defendant tested positive for heroin and cocaine on that day.[14]

The state's asserted use of the mental health record in its argument to the court was that it needed to use the record to show the absence of withdrawal symptoms suffered by the defendant, which, according to the state, was relevant to whether the defendant was intoxicated at the time of the crime.[15] The defense in this case was not that the defendant had a particular drug *habit* relating to the average quantum of drugs used over the years, but his drug *use* on the morning and afternoon of the day on which the victim died. The record related to whether he had a two to three bag a day heroin habit or a two to three bundle a day heroin habit, and was not directly related to the amount of heroin consumption on the day of the victim's death. Thus, the privileged record may not even have been relevant to the defendant's claim that he was intoxicated at the time of the victim's death. It was used, nevertheless, to implicate his guilt.

The use of the privileged record undermined the credibility of the defendant so that the jury would be induced to disregard or to disbelieve his testimony. On the particular facts of this case, we do not, as *Boscarino* did not, undertake a harmless error analysis but rather, order a new trial. That analysis is inappropriate in this case because its factors as reiterated in *State* v. *Slimskey*, supra, 257 Conn. 859, do not fit. This is a case of first impression where there is a head-on collision between the constitutional right of a defendant to testify

---

[14] The defendant was taken to a hospital after he became belligerent when the paramedics were placing the victim in an ambulance, and the defendant was sprayed by police with Mace.

[15] No evidence was introduced in this case to show a correlation between the absence of withdrawal symptoms on the day of the nursing assessment and the defendant's drug use three days earlier on the date of the victim's death.

at his trial and the exception to the use of statutorily privileged material in the cross-examination of a defendant. Because the exceptions to the statutorily mandated privilege are narrowly construed in Connecticut; *Falco* v. *Institute of Living*, supra, 254 Conn. 328; and the constitutional right must remain intact, we hold that on the facts of this case, the constitutional right and the statutory right of the defendant should both be honored. The defendant is entitled to a new trial as to the conviction of manslaughter.

The judgment is reversed only as to the conviction of manslaughter in the first degree and the case is remanded for a new trial. The judgment as to the conviction of risk of injury to a child is affirmed.

In this opinion MIHALAKOS, J., concurred.

SCHALLER, J., dissenting. The majority determines that the defendant, Robert Jenkins, is entitled to a new trial because the trial court improperly allowed the state access to and use of his privileged mental health records. In particular, the majority focuses on the document entitled "In-Patient Mental Health Nursing Assessment," which the state used in the course of cross-examining the defendant. The state argues that the nursing assessment contains nothing to suggest that the defendant was seeking diagnosis or treatment for any mental health condition. Assuming that the document constitutes a mental health record and is, therefore, privileged, I respectfully dissent.

Although I recognize the gravity of this situation, in which fundamental rights and interests are in contention, I believe that this case is controlled by our decision in *State* v. *Brelsford*, 24 Conn. App. 287, 587 A.2d 1062 (1991), and that there are compelling reasons to determine that the defendant in this case waived his privilege, just as the defendant in *Brelsford* impliedly waived his privilege. Id., 294. In essence, I cannot read

*Brelsford* as authorizing the narrow reading of its holding suggested by the majority. As in *Brelsford*, I believe that the raising of the defense here indicated the defendant's plain intention to abandon the privilege. Under these circumstances, I conclude that it would be unfair and inconsistent to permit the retention of the privilege. I would affirm the judgment of the trial court on this issue.

The defendant also argues that the court improperly permitted the state to have access to the remainder of the record in question. As the state points out, the trial record clearly establishes that the only mental health document used by the state at trial was the nursing assessment form. Nothing suggests that any other portion of the document was used in any way. Under these circumstances, I believe our case law compels a conclusion that the access was harmless. I find support in *State* v. *Boscarino*, 204 Conn. 714, 737, 529 A.2d 1260 (1987), for the proposition that a harmless error inquiry is appropriate. Although the majority states that the *Boscarino* court did not undertake a harmless error analysis, I cannot agree with that conclusion.

In *Boscarino*, the court noted that "Section 760 [now § 40-19] of our Practice Book effects a compromise between the defendant's right to avoid self-incrimination and the state's right to procure and present evidence of the defendant's mental state when such evidence is relevant to an issue at trial. . . . [T]o safeguard the rights of criminal defendants to due process of law, § 760 [now § 40-19] must be 'strictly construed to protect the fundamental constitutional right to liberty.' " (Citation omitted.) *State* v. *Boscarino*, supra, 204 Conn. 736.

The court in *Boscarino* concluded that "the state's use of the statement made by the defendant in the court-ordered psychiatric examination violated § 760 [now

§ 40-19], and that the trial court erred in permitting the statement to be used on cross-examination." Id., 736–37. Significantly, the court went on to address the state's argument that "any error precipitated by its use of the defendant's statement" was "irrelevant" or "academic." Id., 737. Therefore, the court, at least implicitly, engaged in a final evaluation of the harm to the defendant under the circumstances of that case, notwithstanding the violation of § 760, now § 40-19, of the rules of practice. Under the circumstances of this case, I believe our case law compels a conclusion that the access was harmless.

For those reasons, I respectfully dissent.