STATE OF CONNECTICUT *v.* ROBERT D. JENKINS
(AC 20849)

Schaller, Dranginis and Dupont, Js.

Argued January 13—officially released May 10, 2005

*Adele V. Patterson*, assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Rosita M. Creamer*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. This appeal returns to this court on remand from our Supreme Court to consider the remaining claim of the defendant, Robert D. Jenkins;

*State* v. *Jenkins*, 271 Conn. 165, 193, 856 A.2d 383 (2004); that the trial court improperly denied him a fair trial by instructing the jury to disregard any evidence of his alleged intoxication if that evidence did not negate the element of intent. Id., 168–69. We affirm the judgment of the trial court.

The following procedural history provides the context of the remand. In 2000, the jury found the defendant guilty of intentional manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1. *State* v. *Jenkins*, supra, 271 Conn. 167–68. The defendant appealed to this court, challenging only his manslaughter conviction. Id., 168. The defendant claimed that the trial court (1) improperly permitted the state to impeach his testimony with portions of department of correction records that were protected by the psychiatrist-patient privilege and (2) improperly charged the jury. Id. This court agreed with the defendant's first claim and granted him a new trial. *State* v. *Jenkins*, 73 Conn. App. 150, 171, 807 A.2d 485 (2002), rev'd in part, 271 Conn. 165, 856 A.2d 383 (2004). In doing so, it did not reach the claim of instructional error. See id., 152 n.3. Our Supreme Court granted the state's petition for certification to appeal from the judgment of this court. *State* v. *Jenkins*, 262 Conn. 917, 811 A.2d 1293 (2002).[1] Although the Supreme Court agreed that the defendant had not waived his claim of privilege

---

[1] The Supreme Court granted certification to appeal, limited to the following issues:

"1. Did the Appellate Court properly conclude that the defendant did not waive a claim of privilege with respect to information relating to the magnitude of his heroin habit contained in his prison record?

"2. Did the Appellate Court properly reverse the defendant's conviction absent any harmless error analysis and, if harmless error analysis is appropriate, was any error harmless?" (Internal quotation marks omitted.) *State* v. *Jenkins*, supra, 262 Conn. 917.

with respect to the records, it concluded that the improper disclosure of the records was harmless error. *State* v. *Jenkins*, supra, 271 Conn. 169. The Supreme Court reversed the judgment of this court, in part,[2] and remanded the case for resolution of the defendant's remaining claim, that of instructional error.[3] Id.

A full recitation of the facts reasonably found by the jury is contained in this court's opinion in *State* v. *Jenkins*, supra, 73 Conn. App. 152–55. The following summary of facts is relevant to the claimed improper jury instruction. The defendant lived in an apartment complex with his girlfriend and her three children, including the victim, who was twenty-three months old. Id., 152. "On February 9, 1996, the defendant arrived home in the morning after consuming heroin, cocaine and marijuana the previous evening and earlier that morning. The defendant continued to consume narcotics and fell asleep on the couch. At some point in the late morning, [his girlfriend] placed the victim in the defendant's care and went to a bake sale at the community center near the apartment complex.

"Shortly before 2 p.m., the defendant came running into the community center screaming for help with the victim in his arms. Blood was observed coming from the victim's nose and mouth, and the defendant's shirt was full of blood. The defendant told [his girlfriend] that the victim had fallen down the stairs." Id., 152–53. Emergency personnel were summoned and eventually transferred the victim to Hartford Hospital where he was declared brain dead on February 10, 1996. Id., 153.

[2] The Supreme Court did not disturb that portion of this court's judgment affirming the defendant's conviction of risk of injury to a child. *State* v. *Jenkins*, supra, 271 Conn. 169 n.6.

[3] The defendant did not assert that the claimed improper jury instruction served as an alternate ground to affirm the judgment of this court, and the parties, therefore, did not brief that claim in the Supreme Court. *State* v. *Jenkins*, supra, 271 Conn. 169 n.7.

The defendant waived his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and gave a written statement to the police, which included the following: "The defendant had consumed two bags of heroin in the morning and was sleepy. He was sitting on the couch and expected the victim to fall asleep. On two occasions, the defendant fell asleep and woke up startled because the victim was not around. On both occasions the defendant found the victim and 'popped [the victim] on his hand.' On the second occasion, the defendant also 'popped [the victim] in the head twice with the belt. [The victim] cried a lot more this time. I grabbed him by his hand and walked him back to the living room. When we got back to the living room I hit him twice in the head with the remote control for the [television] and told him he better sit down and stay down. [The victim] was crying. I laid back on the couch. I faked like I was going to sleep to see if he was going to move again. I closed my eyes just so I could see a little. [The victim] got up like he was going to get something. I got up and grabbed him and punched him [in] the chest and told him he better sit down. After I punched him in the chest it seemed like all the air went out of him because he made this noise. [The victim] fell backwards and he hit his head on the shelving unit where the [television] is. [The victim] just laid there and he wasn't crying or doing anything.' " *State* v. *Jenkins*, supra, 73 Conn. App. 153–54. The defendant took the victim to the bathroom and tried to revive him before taking him to the community center. Id., 154.

"During the trial, the state introduced the defendant's written statement into evidence during its case-in-chief. Part of that statement read: 'I have a heroin problem. Usually I would get a stack of bundles of heroin fronted to me. I would sell 55 bags for $500.00 and then pay back the guy who fronted me. That would leave me

with 45 bags profit. I would spend the money I made for the 45 bags on myself and the stuff for the house. [My girlfriend] knew about my habit. I sniffed 2 to 3 bundles of heroin a day but I know what I was doing when I sniffed the heroin. A bundle is ten bags. Sometimes I would fall asleep but I knew what was going on.' When the state rested its case-in-chief, the defendant informed the court that he would be requesting an instruction on intoxication on the basis of his illegal drug use." Id., 155.

The jury heard conflicting testimony from three experts concerning the length of time between when the victim stopped breathing and when he reached the hospital. The state theorized that the victim died because the defendant delayed seeking help for him. At trial, the defendant did not contest that he inflicted the victim's injuries, but he contested the intent he had when he struck the child.[4] The defendant testified that he struck the victim with two plastic remote control devices. Two expert witnesses testified that the victim's injuries were more consistent with being struck by the metal buckle of a belt. The defendant's belt, which did not have a buckle at the time of trial, was placed in evidence. The police never found the belt buckle or the shirt the victim was wearing when his mother left him in the defendant's care. Furthermore, there was no evidence of blood on the shelving unit for the television.

During closing argument, the prosecutor argued that the defendant delayed seeking medical help for the victim while he disposed of the belt buckle or other items that caused the victim's injuries and asked the jury to find the defendant guilty of capital felony. In response to the charge that he intended to kill the vic-

[4] In his statement to the police, the defendant told them that he hit the victim with a belt. The belt placed in evidence did not have a buckle. On the basis of expert testimony, the jury reasonably could have concluded that the belt had a buckle at the time the defendant struck the victim.

tim, the defendant presented evidence that he was intoxicated at the time he inflicted the injuries, and his counsel argued in favor of a conviction of manslaughter in the second degree or criminally negligent homicide.

The court instructed the jury, in part, on capital felony, manslaughter in the first degree, intent to cause serious physical injury, reckless manslaughter, manslaughter in the second degree and criminally negligent homicide, including the mens rea element of each crime. The court also instructed the jury on intoxication in keeping with the state's request to charge and over the defendant's objection. The court's intoxication instruction was given in two parts, one relating to the lesser included reckless manslaughter offenses and the other regarding the specific intent crimes.[5]

---

[5] The court charged the jury with regard to intoxication in relevant part: "Both intentional and reckless manslaughter are lesser included crimes to capital felony, and each is a manslaughter in the first degree crime. I will now instruct you on the elements comprising the crime of reckless manslaughter. Manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3) of the Penal Code, insofar as it is pertinent to this case, provides as follows: A person is guilty of manslaughter in the first degree when, under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

"There are three elements, each of which the state must prove beyond a reasonable doubt in order to sustain a conviction here. First, that the defendant's conduct evinced or demonstrated an extreme indifference to human life; second, that he recklessly engaged in conduct which created a grave risk of death to another person; third, that he thereby caused the death of another person. I will now go through these elements with you one by one and explain them to you in detail.

"The first element is that the circumstances of the defendant's conduct demonstrated an extreme indifference to human life. The phrase, extreme indifference to human life, has its ordinary meaning. Mere carelessness is not enough, nor is ordinary recklessness sufficient to constitute demonstrating extreme indifference to human life. The law requires circumstances demonstrating the defendant's extreme indifference to human life.

"The second element is that the defendant recklessly engaged in conduct creating a grave risk of death to another person. The defendant's conduct then must have created a grave risk of death to another person, and the defendant's person must have been reckless. A person acts recklessly with respect to a result or to a circumstance described by a statute defining an

The defendant took an exception to the court's intoxication instruction. Defense counsel stated: "[W]e do object to the restriction of the relevance of intoxication to so intoxicated as to be incapable of forming the intent. And I think there is one thing in this charge that

---

offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such a result will occur or that such a circumstance exists. The risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard that a reasonable person would observe in this situation. Recklessness means being aware of a substantial and unjustifiable risk and consciously disregarding that risk. It is more than failing to perceive such a risk. There must be an awareness of the risk and a conscious disregard of it.

"However, if the defendant is intoxicated and that intoxication was self induced and, as a result of that self induced intoxication, he was unaware of or disregarded a risk of which he would have been aware had he not been intoxicated, it is immaterial that he was unaware of or disregarded the risk, and he must be treated and viewed just as if he were not intoxicated and as if he had been aware of and disregarded the risk. Intoxication here means a substantial disturbance of mental or physical capacities resulting from the introduction of substances, including drugs and alcohol, into the body. . . .

"You will recall that there was evidence offered by the defendant that he was too intoxicated to form specific intent. This requires that I instruct you on the law of intoxication and how it relates to the issue of intent. Our statute, General Statutes § 53a-7, provides, insofar as it is relevant here, that intoxication is not a defense to a criminal charge. But in any prosecution for an offense, evidence of the defendant's intoxication may be offered by the defendant whenever it is relevant to negate an element of the crime charged. Intoxication here means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body. As applied here, it means that if you find that the defendant was so intoxicated that he was not mentally able even to form the intent to commit the crime, then the intent element of the crime charged would not be proven, and you would be required to acquit the defendant of that charge. This does not mean, however, that the defendant has the burden of proving that he was too intoxicated to form the intent required as an element of the crime.

"The state retains the burden of proof beyond a reasonable doubt on this issue of intent as on all the other elements of the crime. If you find that the defendant was intoxicated, as I have defined that term for you, at the time of the crime, you may consider whether he lacked the mental faculties due to his intoxication to form the specific intent for the commission of the crime of murder and, or, the crime of intentional manslaughter, if you reach that lesser included crime. The simple fact alone, however, that the defendant may have been intoxicated at the time the crime was committed

is not covered heretofore. And our objection is that now we are sort of in a double bind because of the instruction that you gave at page twenty-five [of the instructions] with respect to intoxication not constituting a defense to recklessness versus the charge that you gave on page thirty-one that it doesn't even rise to the level of relevance on intent unless he's completely incapacitated and unable to form intent. Now, it seems to me you've read it out of the defense case as a defense to intent and told them, however, if he was intoxicated at all, that completely knocks out any defense he might have to recklessness."

The essence of the defendant's claim on appeal is that by instructing the jury to disregard evidence of intoxication if it did not negate the element of intent, the trial court deprived him of his right to a fair trial because it precluded the jury from considering such evidence when determining whether he possessed the lesser culpable mental state of recklessness at the time of the crime. The defendant contends that if the jury had been allowed to consider evidence of intoxication as proof of recklessness, it is possible that the jury would have found him guilty of reckless manslaughter in the first or second degree, instead of intentional manslaughter.[6]

---

is not enough for you to find for the defendant on this issue. You must, if you are to find for the defendant on this issue, find that while he was committing the murder, if you find that fact proven, he was so intoxicated that his mind was incapable of forming the intent to do so. It is only if you find that his intoxication was to this degree and with this result that you should consider it. If, however, you find that he was not intoxicated or, that he was intoxicated, but not so extremely so that he could not form the required intent, you should disregard the evidence of his intoxication and not consider it in his defense. Whether or not the defendant was so intoxicated that he could not and did not form the required intent is a question of fact for you to determine. These instructions on intoxication are equally applicable to the crime of capital felony and the lesser included crime of intentional manslaughter."

[6] In his brief, the defendant claimed that the court denied him a fair trial by charging the jury that it could not consider evidence of intoxication as proof of recklessness unless the jury first found that he had been "so

When reviewing a constitutional challenge to the trial court's instructions, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. See *State* v. *Fauci*, 87 Conn. App. 150, 162, 865 A.2d 1191, cert. granted on other grounds, 273 Conn. 921, 871 A.2d 1029 (2005). "It is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Faria*, 254 Conn. 613, 634, 758 A.2d 348 (2000). "Whether a charge is possibly misleading depends on the substance rather than the form of what is said." *State* v. *Kurvin*, 186 Conn. 555, 565, 442 A.2d 1327 (1982).

On the basis of our review of the court's entire instruction to the jury, we conclude that it was not reasonably possible that the jury was misled, and the court therefore did not deny the defendant a fair trial. The court instructed the jury on the elements of the crimes with which the defendant was charged. It also charged the jury on the language of General Statutes

intoxicated that his mind was incapable of forming the intent . . . ." The defendant argues that the instruction violated his right to a fair trial by (1) misinterpreting General Statutes § 53a-7 to his detriment and (2) invading the fact-finding province of the jury. The defendant's claim focuses on one sentence in the court's instruction on intoxication.

§ 53a-7,[7] informing the jury that intoxication was not a defense, but that it was relevant to negate the element of intent with respect to the specific intent crimes with which the defendant was charged. The court repeatedly charged the jury that the state carried the burden of proof beyond a reasonable doubt on the element of intent. See *State* v. *Williams*, 25 Conn. App. 456, 459–61, 595 A.2d 895, cert. denied, 220 Conn. 916, 597 A.2d 339 (1991).

The substance of the instruction that the defendant challenges, i.e., the jury should disregard evidence of intoxication if it does not negate the element of intent, has been upheld on numerous occasions by the appellate courts of this state. See, e.g., *State* v. *Faria*, supra, 254 Conn. 635–36 ( " 'if you find the fact proven that he was committing those acts, that at that time he was so intoxicated that his mind was incapable of forming the intent to do so, it's only if you find that [the defendant's] intoxication was to this degree and with this result that you should consider it' "); *State* v. *Austin*, 244 Conn. 226, 238, 710 A.2d 732 (1998) ( " '[y]ou must first decide whether the defendant was intoxicated at the time of the alleged crime, and second, whether he was incapable of possessing the requisite specific criminal intent' "); *State* v. *Stevenson*, 198 Conn. 560, 570, 504 A.2d 1029 (1986) ("court's statement, contrary to the defendant's claim, that voluntary intoxication was significant only when it has proceeded so far as to have affected the operation of the mind of the accused and made him incapable for the time being of

---

[7] General Statutes § 53a-7 provides: "Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged, provided when recklessness or criminal negligence is an element of the crime charged, if the actor, due to self-induced intoxication, is unaware of or disregards or fails to perceive a risk which he would have been aware of had he not been intoxicated, such unawareness, disregard or failure to perceive shall be immaterial. As used in this section, 'intoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body."

forming a rational intent or of controlling his will, was correct not only in the context of this charge on intoxication, but as a statement of law"); *State* v. *Burgos*, 37 Conn. App. 404, 417, 656 A.2d 238 ("defendant's claim that the jury's consideration of intoxication evidence was improperly limited is without merit"), cert. denied, 233 Conn. 915, 659 A.2d 186 (1995); *State* v. *Williams*, supra, 25 Conn. App. 458–59 (whether defendant's mind was so obscured that he was incapable of possessing intent to commit acts constituting crime of murder). Furthermore, the charge given by the court was in conformity with D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (2d Ed. 1997) § 7.4, pp. 372–73.

We particularly reject the defendant's argument that the court's instruction prevented the jury from considering whether he was intoxicated at a level that "caused him not to form the specific intent to kill on the question of recklessness." The court's instruction was in keeping with the policy that § 53a-7 embodies, which our Supreme Court addressed years ago in *State* v. *Shine*, 193 Conn. 632, 479 A.2d 218 (1984), and bears repeating here. "It is entirely reasonable for the legislature to make a rule that whatever cognitive elements there are in recklessness, they cannot be negated by evidence of voluntary intoxication. [T]he majority of cases in America support the creation of a special rule relating to intoxication, so that, if the only reason why the defendant does not realize the riskiness of his conduct is that he is too intoxicated to realize it, he is guilty of the recklessness which the crime requires. The Model Penal Code [§ 2.08 (2)] adopts the latter view on the ground that awareness of the potential consequences of excessive drinking on the capacity of human beings to gauge the risks incident to their conduct is by now so dispersed in our culture that we believe it fair to postulate a general equivalence between the risks cre-

ated by the conduct of the drunken actor and the risks created by his conduct in becoming drunk." (Internal quotation marks omitted.) *State* v. *Shine*, supra, 640–41.[8]

"The concept of self-induced intoxication, by definition, requires that the defendant be aware at the outset that the substance he is about to ingest may affect his mental faculties. It is a matter of common knowledge that the excessive use of liquor or drugs impairs the perceptual, judgmental and volitional faculties of the user. Also, because the intoxication must be self-induced, the defendant necessarily must have had the conscious ability to prevent this temporary incapacity from coming into being at all. Self-induced intoxication, therefore, by its very nature involves a degree of moral culpability. The moral blameworthiness lies in the voluntary impairment of one's mental faculties with knowledge that the resulting condition is a source of potential danger to others. . . . It is this blameworthiness that serves as the basis for [the] rule of exclusion. Thus, when a defendant chooses to knowingly introduce intoxicants into his body to the point of becoming temporarily impaired in his powers of perception, judgment and control, the policy enunciated in [a prior case] prohibits him from utilizing his intoxication as a defense to crimes requiring the mens rea of knowingly, willfully, recklessly or with criminal negligence.

"While the defendant cannot introduce evidence of intoxication to dispute recklessness the state can introduce that evidence to prove recklessness." Id., 642. The defendant claims that this rule deprives him of a fair trial. When considered in the context of the standard that is applied to determine whether conduct is reck-

---

[8] We recognize that intoxication may be caused by the ingestion of either alcohol or drugs or both. See *Wentland* v. *American Equity Ins. Co.*, 267 Conn. 592, 610, 840 A.2d 1158 (2004).

less, it is apparent that the operation of this rule did not deprive the defendant of the opportunity to contest recklessness. "In determining whether the defendant's conduct was reckless, the inquiry is not whether the defendant was too drunk to be aware of the risks but rather whether his conduct while intoxicated constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. . . . Evidence of the defendant's voluntary intoxication is highly relevant as proof of recklessness but is irrelevant to negate recklessness." (Citations omitted; internal quotation marks omitted.) Id., 641–42.

Accordingly, we conclude that there was no reasonable possibility that the jury was misled by the trial court's instructions on intoxication.

The judgment is affirmed.

In this opinion the other judges concurred.