STATE OF CONNECTICUT *v.* ROBERT JENKINS
(SC 16871)

Sullivan, C. J., and Borden, Norcott, Katz and Palmer, Js.

166

Argued November 24, 2003—officially released September 21, 2004

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Rosita M. Creamer*, former senior assistant state's attorney, for the appellant (state).

*Adele V. Patterson*, assistant public defender, for the appellee (defendant).

*Opinion*

PALMER, J. A jury found the defendant, Robert Jenkins, guilty of manslaughter in the first degree[1] in viola-

---

[1] The state had charged the defendant with capital felony. The jury found the defendant not guilty of that charge but found him guilty of the lesser included offense of manslaughter in the first degree.

tion of General Statutes § 53a-55 (a) (1)[2] and risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1.[3] The trial court rendered judgment in accordance with the jury verdict,[4] and the defendant appealed to the Appellate Court. On appeal to the Appellate Court, the defendant challenged only the validity of his conviction of intentional manslaughter,[5] claiming that the trial court improperly had: (1) allowed the state to impeach his trial testimony with certain department of correction records that were protected by the psychiatrist-patient privilege; and (2) denied him a fair trial by instructing the jury to disregard any evidence of the defendant's alleged intoxication if that evidence did not negate the element of intent. The Appellate Court agreed with the defendant's claim regarding the psychiatrist-patient privilege and granted the defendant a new

[2] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . ."

Because the defendant was found guilty of violating that part of § 53a-55 (a) pertaining to *intentional* manslaughter, we hereinafter refer to the defendant's conviction under § 53a-55 (a) (1) as one of intentional manslaughter.

[3] General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1, provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured . . . or does any act likely to impair the health . . . of any such child . . . shall be guilty of a class C felony."

[4] The trial court sentenced the defendant to a twenty year prison term for the intentional manslaughter conviction and a consecutive ten year prison term for the risk of injury conviction, for a total effective sentence of thirty years imprisonment.

[5] The defendant did not challenge his risk of injury conviction on appeal to the Appellate Court; see *State* v. *Jenkins*, 73 Conn. App. 150, 152 n.2, 807 A.2d 485 (2002); and the Appellate Court therefore affirmed the judgment of conviction as to that offense. Id., 171. The portion of the Appellate Court's judgment affirming the defendant's risk of injury conviction is not at issue in this appeal.

trial on the intentional manslaughter charge. *State* v. *Jenkins*, 73 Conn. App. 150, 171, 807 A.2d 485 (2002). In light of that conclusion, the Appellate Court did not reach the defendant's claim of instructional impropriety. We granted the state's petition for certification to appeal limited to the following issues: First, "[d]id the Appellate Court properly conclude that the defendant did not waive a claim of privilege with respect to information relating to the magnitude of his heroin habit contained in his [department of correction] record[s]?" *State* v. *Jenkins*, 262 Conn. 917, 811 A.2d 1293 (2002). Second, "[d]id the Appellate Court properly reverse the defendant's conviction absent any harmless error analysis and, if harmless error analysis is appropriate, was any error harmless?" Id. Although we agree with the Appellate Court that the defendant did not waive his right to invoke the psychiatrist-patient privilege with respect to his department of correction records, we further conclude that the improper disclosure of those records was harmless. We therefore reverse the judgment of the Appellate Court in part[6] and remand the case to that court for a determination of the defendant's claim of instructional error.[7]

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found and the following relevant procedural history. "The defendant lived with his girlfriend, Lisa Pettiford, and her three children, including the victim, in an apartment in Hartford. The victim was the youngest of the three children and was twenty-three months old at the time of his death. On February 9, 1996, the defendant arrived home in the morning after consuming heroin,

---

[6] We do not disturb that portion of the Appellate Court's judgment affirming the defendant's risk of injury conviction. See footnote 5 of this opinion.

[7] The defendant does not claim that the allegedly improper jury charge serves as an alternate ground for affirmance and, therefore, neither party has briefed that issue in connection with this certified appeal.

cocaine and marijuana the previous evening and earlier that morning. The defendant continued to consume narcotics and fell asleep on the couch. At some point in the late morning, Pettiford placed the victim in the defendant's care and went to a bake sale at [a] community center near the apartment complex.

"Shortly before 2 p.m., the defendant came running into the community center screaming for help with the victim in his arms. Blood was observed coming from the victim's nose and mouth, and the defendant's shirt was full of blood. The defendant told Pettiford that the victim had fallen down the stairs. The director of the community center called for emergency assistance, and police, paramedics and fire personnel responded to the scene. The paramedics observed that the victim was not breathing, had no blood pressure, but appeared to have a pulse, and they observed that there 'was quite a bit of trauma to the [victim's] head and face.' The defendant told the emergency personnel that the victim had suffered the injuries when he fell down stairs.[8]

"The victim was transferred to Hartford Hospital and was in full cardiac arrest when he arrived at approximately 2:20 p.m. Medical personnel were successful in resuscitating [the victim] at the hospital, but the victim exhibited no brain function. On February 10, 1996, at approximately 6 p.m., [medical personnel declared the victim] brain dead.

---

[8] The defendant was visibly upset at the scene. Emergency personnel, who initially believed that the defendant was the victim's father or guardian, invited the defendant to ride in the ambulance with the victim, but a police officer subsequently asked the defendant to exit the ambulance. After the defendant refused, a struggle ensued during which the police sprayed the defendant with pepper spray. The defendant then was transported to Saint Francis Hospital and Medical Center (hospital) to be treated for exposure to the pepper spray. At the hospital, the police found four small envelopes in the defendant's possession, at least one of which was later determined to contain opiates. A urinalysis performed at the hospital revealed the presence of cocaine and opiates in the defendant's urine.

"On February 12, 1996, Detective James Rovella of the Hartford police department advised the defendant that he was going to be arrested on charges of murder and tampering with evidence. The defendant agreed to talk to Rovella concerning the incident and waived his *Miranda*[9] rights. In a written statement the defendant gave to the police, he admitted that he had hit the victim.

"The defendant's written statement included the following. The defendant had consumed two bags of heroin in the morning and was sleepy. He was sitting on the couch and expected the victim to fall asleep. On two occasions, the defendant fell asleep and woke up startled because the victim was not around. On both occasions, the defendant found the victim and 'popped [the victim] on his hand.' On the second occasion, the defendant also 'popped [the victim] in the head twice with the belt. [The victim] cried a lot more this time. [The defendant continued:] I grabbed him by his hand and walked him back to the living room. When we got back to the living room I hit him twice in the head with the remote control for the [television] and told him he better sit down and stay down. [The victim] was crying. I laid back on the couch. I faked like I was going to sleep to see if he was going to move again. I closed my eyes just so I could see a little. [The victim] got up like he was going to get something. I got up and grabbed him and punched him [in] the chest and told him he better sit down. After I punched him in the chest it seemed like all the air went out of him because he made this noise. [The victim] fell backwards and he hit his head on the shelving unit where the [television] is. [The victim] just laid there and he wasn't crying or doing anything.'[10] The defendant then described how he took

[9] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[10] "The defendant claimed that the belt he used to hit the victim did not contain a buckle. The belt admitted at trial did not contain a buckle. There was evidence presented at trial that some of the victim's injuries could be consistent with [the defendant's use of] a buckle from a belt, and it was the state's theory that the defendant disposed of the buckle before taking

the victim to the bathroom and tried to revive him. He then grabbed their coats and went to the community center where [Pettiford] was located.

"The victim's treating physician, Betty Spivack, testified that the injuries 'were typical of multiple blows to the head coming from different directions striking different parts of the head. That is not typical of accidental injury such as a fall down stairs. This is, however, very typical of assaultive injuries.'

"On February 11, 1996, the chief medical examiner for the state of Connecticut, Harold Wayne Carver II, conducted an autopsy . . . . Carver concluded that the victim 'died as a result of blunt traumatic head injury' and classified 'the manner of death as homicide.'

"During the trial, the state introduced the defendant's written statement into evidence during its case-in-chief. Part of that statement [provided]: 'I have a heroin problem. Usually I would get a stack of bundles of heroin fronted to me. I would sell 55 bags for [$500] and then pay back the guy who fronted me. That would leave me with 45 bags profit. I would spend the money I made for the 45 bags on myself and the stuff for the house. . . . [Pettiford] knew about my habit. I sniffed 2 to 3 bundles of heroin a day but I know what I was doing

the victim to the community center." *State v. Jenkins*, supra, 73 Conn. App. 154 n.5. In particular, Pettiford testified that the defendant's belt had a "silver square buckle" on it the last time she saw the belt before the victim's death. Pettiford further testified that the victim was wearing a "Power Rangers" shirt when she left him in the defendant's care. The defendant's belt buckle and the victim's shirt were not present in the apartment and never were recovered by the police. The state also adduced evidence to indicate that the defendant had cleaned up some of the victim's blood. For example, even though a laceration on the victim's head ordinarily would have resulted in a significant loss of blood, and even though bloodstains were found in other areas of the apartment, there were no traces of blood on or beneath the shelving unit on which the victim hit his head, on the remote control that the defendant used to strike the victim, or on the belt itself.

when I sniffed the heroin. A bundle is ten bags. Sometimes I would fall asleep but I knew what was going on.'

"When the state [concluded] its case-in-chief, the defendant informed the court that he would be requesting an instruction on intoxication on the basis of his illegal drug use. Subsequently, the [state] advised the court that [it] had subpoenaed some department of correction records, which the state claimed were relevant to determine whether the defendant suffered from withdrawal symptoms. The absence of withdrawal symptoms would presumably rebut the defense that the defendant was intoxicated at the time of the injuries to the child. The state also cited as a reason for requesting the records that the defendant's attorney had indicated that the defendant would be testifying and that, therefore, the issue of drug use was relevant. [The defendant notified the court that the department of correction records could contain mental health records and that, to the extent that they did, that portion of the department of correction records would be shielded from discovery by the state under the psychiatrist-patient privilege. See General Statutes §§ 52-146d through 52-146f.][11]

---

[11] General Statutes § 52-146d provides in relevant part: "As used in sections 52-146d to 52-146i, inclusive . . .

"(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility;

"(3) 'Consent' means consent given in writing by the patient or his authorized representative . . .

"(5) 'Mental health facility' includes any hospital, clinic, ward, psychiatrist's office or other facility, public or private, which provides inpatient or outpatient service, in whole or in part, relating to the diagnosis or treatment of a patient's mental condition;

"(6) 'Patient' means a person who communicates with or is treated by a psychiatrist in diagnosis or treatment;

"Later that day, the court asked the defendant if it could view the records in camera to address the state's concerns and stated that 'anything I read will be in confidence.' The defendant gave the court permission to review the records, including the mental health records, in camera to determine 'what the state may receive.'

"The defendant was scheduled to take the witness stand to testify on the next court date. Before the defendant took the witness stand, the court noted that it had reviewed the [department of correction] records in camera and stated: 'The court has examined them and finds at this point, with the exception of a reference to one or two matters that are probably privileged, finds nothing that would preclude the state from examining the records. Now, having said that, however, the court is going to request of the [state] that if the medical records are to be used, portions of them, in cross-examination, that we have a recess between the direct examination and the cross-examination so that the court can hear in limine which matters the [state] wants to address.' The [state] then asked that the portions of the file that are privileged be redacted. The court reiterated its ruling that the state review with the court those portions it would like to use on cross-examination

"(7) 'Psychiatrist' means a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry, or a person reasonably believed by the patient to be so qualified."

General Statutes § 52-146e provides in relevant part: "(a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. . . ."

before the state would be allowed to proceed. The court did not order any portion of the record to be redacted and did not specify what 'one or two matters' were 'probably privileged.' Immediately thereafter, the state and the defendant were both provided a full copy of the records.

"That same day, the defendant testified that he had used heroin, cocaine and marijuana in the months before the victim's death. He further testified that he had used approximately twenty to thirty bags of heroin a day on average, which was consistent with his written statement. The defendant testified that on the night of February 8, 1996, he had used approximately fifteen bags of heroin along with cocaine and marijuana, and that on the morning of February 9, 1996, he had used an additional three bags of heroin.

"After reviewing the department of correction records that had been disclosed and given to the parties that morning, the defendant sought to seal the records concerning his mental health. The defendant asserted that approximately fifteen of the pages were privileged mental health records [made] 'for the purpose of counseling and treatment,' and objected to the use of any portion of the fifteen pages, which were marked as 'exhibit M' for identification. The exhibit is the defendant's entire mental health record received from the department of correction.

"The cover sheet of exhibit M is labeled 'Mental Health Initial Assessment' and is dated July 30, 1996. It contains basic statistics about the defendant, a summary of the defendant's mental health history, psychoactive medication history, marital status and other biographical information. The fifteenth sheet contains the defendant's signed consent to be admitted to the mental health unit [of the department of correction] for mental health assessment and treatment. The interior

sheets of exhibit M contain details of the defendant's relationship with his family, a mental health treatment plan, a mental status evaluation and clinical records spanning February 13, 1996, through October 30, 1996.

"The state told the court that it intended during cross-examination to use one page out of the fifteen pages that the defendant was claiming were privileged.[12] The page was the fourteenth page of exhibit M and was entitled 'In-Patient Mental Health Nursing Assessment' (nursing assessment). The state claimed that the [nursing assessment] did not meet the statutory requirement of being a communication with a psychiatrist or member of his staff for the purpose of diagnosis or treatment. The state further argued that it would use the [nursing assessment] only to impeach the defendant's credibility and challenge his defense of intoxication. The state argued that 'there's a nursing assessment, and it includes an interview with the defendant in which he's specifically asked about the history of substance abuse, and he gives an amount that's inconsistent with what he's testified to. . . . I don't believe that just because the defendant got himself [admitted to] a mental health unit . . . he should be shielded from that inconsistent statement that he made with respect to his drug use.'

"The nursing assessment is dated February 13, 1996. It contains abbreviated information about the defendant's use of drugs since 1985, including 'yes' or 'no' answers to history of withdrawal symptoms and the presence of withdrawal symptoms. The history of drug use is in close proximity to the information concerning withdrawal symptoms. It would be difficult to read about the withdrawal symptoms without also reading [about] the history of the defendant's drug use.

---

[12] The state acknowledged that the other pages of exhibit M were mental health records within the meaning of § 52-146d and, therefore, were privileged under § 52-146e. *State* v. *Jenkins*, supra, 73 Conn. App. 157 n.6

"The court concluded that 'in view of [the defendant's] testimony on direct examination as to his volume of heroin consumption, I will permit that.' The defendant reiterated his objection pursuant to the statutory [psychiatrist-patient] privilege . . . noting that the nurse who conducted the interview was under the supervision of a psychiatrist.

"The defendant then requested a brief recess to subpoena the supervisor of the mental health unit [of the department of correction] to establish that the interview was for the purpose of mental health treatment. The court stated: 'I'm not going to grant any recess. I'm going to bring the jury out. Let's go. . . . If you want to subpoena [the supervisor] . . . and we can squeeze him in [next week], we'll do so.'[13] The defendant responded that it would be too late at that time, and the jury would have already heard the state's cross-examination of the defendant.

"The direct examination of the defendant then continued. During cross-examination . . . the state inquired as to the statement given during the mental health interview that was inconsistent with his written statement and his direct testimony. The defendant answered that the nursing assessment was a mistake and that he did consume twenty to thirty bags of heroin a day, rather than two to three bags a day as [he had] indicated [in] the nursing assessment.

"During the defendant's redirect testimony and during the recross-examination, the defendant's inconsistent statement was the *only* topic addressed. The defendant reiterated that he consumed twenty to thirty bags of heroin a day. The testimony concerning the inconsistent statement consisted of six pages [of tran-

---

[13] The director of health, mental health and addiction services for the department of correction was subpoenaed and did testify after the defendant's trial had concluded. *State* v. *Jenkins*, supra, 73 Conn. App. 159 n.7.

script, which included cross-examination, redirect examination and recross-examination.[14] Thereafter, the case was submitted to the jury, which found the defendant guilty of intentional manslaughter and risk of injury to a child.]

"On May 5, 2000, the court heard oral arguments concerning the defendant's motions for a judgment of acquittal and for a new trial.[15] In support of the motions, the defendant called Bret Rayford, the director of health, mental health and addiction services for the department of correction. Rayford testified that: 'These [exhibit M] are mental health records that run from the initial mental health assessment, to include a mental health treatment plan [and] progress notes with documentation from mental health and other psychiatric staff . . . .' Rayford also testified that the nurses and social workers were working under the supervision of a psychiatrist. He reiterated that all of the forms, including the nursing assessment, supplied information and were mental health records, including the biographical data and the former drug use.

"The defendant argued that he had not waived the psychiatrist-patient privilege. The defendant further argued that the defense presented at trial was not a defense relating to his mental condition, but to his intoxication at the time the incident occurred, which negated intent. He argued that this was not similar to a defense of insanity. The same day, the defendant's motions for a judgment of acquittal and for a new trial were denied

---

[14] "The jury during its deliberations asked to have read to it the entire testimony of the defendant. That was done, with the court noting that the reading took two and one-half hours. A good portion of direct examination related to the quantity of drug use of the defendant both prior to and at the time of the death of the victim." *State* v. *Jenkins*, supra, 73 Conn. App. 159 n.8.

[15] "The defendant also filed a motion requesting an order concerning his department of correction mental health records, which motion requested that the court seal exhibit M. The state did not object, and the court granted that motion on the same day." *State* v. *Jenkins*, supra, 73 Conn. App. 159 n.9.

and the defendant was sentenced." (Emphasis in original.) *State* v. *Jenkins*, supra, 73 Conn. App. 152–60.

On appeal to the Appellate Court, the defendant sought a new trial, claiming that the trial court improperly had: (1) allowed the state access to and use of his privileged mental health records; and (2) denied him a fair trial by instructing the jury to disregard any evidence of the defendant's intoxication if it did not negate the element of intent. Id., 152. The Appellate Court agreed with the defendant's claim that the trial court improperly had allowed the state access to and use of his mental health records in violation of the psychiatrist-patient privilege; id., 165; and concluded that the defendant was entitled to a new trial on the intentional manslaughter charge. Id., 171. In reaching its conclusion, the Appellate Court determined, first, that the defendant's claim of intoxication did not constitute a waiver of his right to invoke the privilege; see id., 162–64; and second, that harmless error analysis was not appropriate in a case such as the present one, in which the defendant's right to testify and his right to the confidentiality of privileged material both were implicated.[16] See id., 170–71. In light of its determination that the defendant was entitled to a new trial due to the breach of his psychiatrist-patient privilege, the Appellate Court did not reach the defendant's claim of instructional error. Id., 152 n.3.

We agree with the Appellate Court that the defendant's claim of intoxication did not constitute a waiver of the psychiatrist-patient privilege. We disagree with the Appellate Court, however, that the violation of that privilege is not subject to harmless error analysis. We further conclude that the violation of the privilege was

---

[16] Judge Schaller dissented from the majority opinion, concluding that, to the extent that the state's use of the defendant's mental health records was improper, any such impropriety was subject to harmless error analysis and was harmless. *State* v. *Jenkins*, supra, 73 Conn. App. 172–73 (*Schaller, J.*, dissenting).

harmless. We therefore reverse that portion of the Appellate Court's judgment reversing the defendant's conviction of intentional manslaughter and remand the case to the Appellate Court for that court's consideration of the defendant's claim of instructional impropriety.

I

The defendant contends that the Appellate Court correctly concluded that the trial court improperly had disclosed his mental health records to the state without his consent in violation of the statutory psychiatrist-patient privilege. The state maintains that the defendant waived his right to invoke the privilege with respect to those records.[17] We agree with the defendant that he did not waive his right to invoke the privilege and that the disclosure of his mental health records to the state therefore was improper.

"Connecticut has a broad psychiatrist-patient privilege that protects the confidential communications or records of a patient seeking diagnosis and treatment. [General Statutes] §§ 52-146d, 52-146e; see *State* v. *Toste*, 178 Conn. 626, 629, 424 A.2d 293 (1979); *State* v. *White*, 169 Conn. 223, 234, 363 A.2d 143, cert. denied, 423 U.S. 1025 [96 S. Ct. 469, 46 L. Ed. 2d 399] (1975). The privilege covers not only communications between the patient and psychiatrist, but also all communications relating to the patient's mental condition between the patient's family and the psychiatrist and his staff and employees, as well as records and communications prepared at mental health facilities. [General Statutes] § 52-146d." (Internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988). Our statutory scheme prohibits the disclosure of any covered records or communications without the written

---

[17] The state concedes that exhibit M was a mental health record covered by the psychiatrist-patient privilege.

consent of the patient or his authorized representative. General Statutes § 52-146e (a).

General Statutes § 52-146f[18] lists the limited exceptions to the general rule of nondisclosure. As we pre-

[18] General Statutes § 52-146f provides in relevant part: "Consent of the patient shall not be required for the disclosure or transmission of communications or records of the patient in the following situations as specifically limited:

"(1) Communications or records may be disclosed to other persons engaged in the diagnosis or treatment of the patient . . . if the psychiatrist in possession of the communications or records determines that the disclosure or transmission is needed to accomplish the objectives of diagnosis or treatment. . . .

"(2) Communications or records may be disclosed when the psychiatrist determines that there is substantial risk of imminent physical injury by the patient to himself or others . . . .

"(3) Except as provided in section 17b-225, the name, address and fees for psychiatric services to a patient may be disclosed to individuals or agencies involved in the collection of fees for such services. . . .

"(4) Communications made to or records made by a psychiatrist in the course of a psychiatric examination ordered by a court . . . may be disclosed at judicial or administrative proceedings in which the patient is a party, or in which the question of his incompetence because of mental illness is an issue, or in appropriate pretrial proceedings, provided the court finds that the patient has been informed before making the communications that any communications will not be confidential and provided the communications shall be admissible only on issues involving the patient's mental condition.

"(5) Communications or records may be disclosed in a civil proceeding in which the patient introduces his mental condition as an element of his claim or defense . . . .

"(6) Communications or records may be disclosed to (A) the Commissioner of Public Health in connection with any inspection, investigation or examination of an institution, as defined in subsection (a) of section 19a-490, authorized under section 19a-498, or (B) the Commissioner of Mental Health and Addiction Services in connection with any inspection, investigation or examination authorized under subsection (f) of section 17a-451.

"(7) Communications or records may be disclosed to a member of the immediate family or legal representative of the victim of a homicide committed by the patient where such patient has, on or after July 1, 1989, been found not guilty of such offense by reason of mental disease or defect pursuant to section 53a-13, provided . . . such communications shall only be available during the pendency of, and for use in, a civil action relating to such person found not guilty pursuant to section 53a-13.

"(8) If a provider of behavioral health services that contracts with the Department of Mental Health and Addiction Services requests payment, the name and address of the person, a general description of the types of services

viously have recognized, "no exception is available beyond those contained in § 52-146f." *Falco* v. *Institute of Living*, 254 Conn. 321, 330, 757 A.2d 571 (2000). In drafting the exceptions to the psychiatrist-patient privilege, the legislature sought to strike a balance between the importance of promoting frank and open communications between psychiatrists and their patients, on the one hand, and the truth-seeking function of judicial proceedings, on the other.[19] To that end, the legislature provided two exceptions relevant to such proceedings. First, a patient's consent is not required prior to the disclosure of records or communications made in connection with a court-ordered psychiatric examination provided that (1) the patient is informed prior to the examination that any communications will not be protected by the privilege, and (2) the communications are admitted only on issues relating to the patient's mental condition. General Statutes § 52-146f (4). Second, a patient's consent is not required prior to the disclosure of records or communications in a *civil* proceeding in which the patient introduces his mental condition as an element of his claim or defense. General Statutes § 52-146f (5).

provided, and the amount requested shall be disclosed to the department . . . ."

Although § 52-146f was amended in 1997; see Public Acts, Spec. Sess., June 18, 1997, No. 97-8, § 82; and 1999; see Public Acts 1999, No. 99-178, § 1; Public Acts, Spec. Sess., June, 1999, No. 99-2, § 21; those amendments have no bearing on the merits of this appeal. For ease of reference, therefore, we refer to the current revision of § 52-146f.

[19] For example, one of the drafters of Public Acts 1961, No. 529, which was codified at General Statutes (Cum. Sup. 1961) § 52-146a, the statutory precursor to §§ 52-146d through 52-146f, testified that, "in drafting the bill, [the drafters] proceeded with a very deliberate concern for the problem of balancing of interest[s]. We realized that society had a very large stake in effective fact finding . . . . We also bore in mind that there was this relationship critically important to the development [of] the mental health program in the state." Conn. Joint Standing Committee Hearings, Judiciary and Governmental Functions, Pt. 2, 1961 Sess., p. 858, remarks of Professor Abraham Goldstein.

Because the defendant's trial was a *criminal* proceeding and because the records disclosed to the state were not made in conjunction with a court-ordered psychiatric examination, the defendant's consent was a necessary precondition to the disclosure of his records. The defendant did not give his consent to the disclosure of his mental health records to the state, however. Indeed, he expressly objected to the trial court's disclosure of those records.

The state asserts that the defendant's conduct constituted an implied waiver of his right to invoke the psychiatrist-patient privilege. Specifically, the state contends that the defendant waived his right to invoke the privilege by virtue of his testimony, tendered in support of his claim that he was intoxicated when he fatally wounded the victim, that he habitually had used twenty to thirty bags of heroin per day and that he had consumed a number of bags of heroin the night before and the morning of the victim's death. The state maintains that, by raising a claim of intoxication, the defendant waived his right to preclude the state from access to the notation, which was otherwise privileged because it is part of his mental health records, indicating that he had reported a habit of consuming only two or three bags of heroin per day. We disagree.

The statute does not authorize the disclosure of psychiatric records or communications upon such an implied waiver but, instead, requires the patient's *express* consent. See, e.g., *State* v. *Pierson*, 201 Conn. 211, 222, 514 A.2d 724 (1986) (§§ 52-146d and 52-146e constitute "legislative restrictions upon the principle of implied waiver"). Moreover, in the absence of express consent by the patient, courts have no authority to create nonstatutory exceptions to the general rule of nondisclosure. "[T]he exceptions to the general rule of nondisclosure of communications between psychiatrist and patient were drafted narrowly to ensure that the

confidentiality of such communications will be protected unless important countervailing considerations require their disclosure." *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 195, 663 A.2d 1001 (1995). It is the responsibility of the legislature, not the courts, to balance the patient's right to confidentiality against any other opposing considerations. *Falco* v. *Institute of Living*, supra, 254 Conn. 330 n.7. As we have stated, "it is contrary to the language of the statute and the intent of the legislature for courts to make discretionary case-by-case determinations of when the privilege may be overridden." Id., 331. Accordingly, the defendant's claim of intoxication did not constitute an implied waiver of his claim of privilege with respect to his mental health records.

The state nonetheless contends that our precedent supports the conclusion that the defendant may impliedly waive his right to invoke the psychiatrist-patient privilege by raising the issue of his intoxication. In support of this contention, the state relies on a line of cases discussing implicit waivers in the context of court-ordered psychiatric examinations. We have stated in such cases that "[t]he defendant may decide whether to raise the issue of his mental state but if he chooses to do so he exposes his mental processes to reasonable examination by the state." (Internal quotation marks omitted.) *State* v. *Steiger*, 218 Conn. 349, 362, 590 A.2d 408 (1991). Furthermore, "we have . . . repeatedly recognized that the state must be afforded a fair opportunity to acquire information that will enable it to respond intelligently to defenses that concern a defendant's mental status." (Internal quotation marks omitted.) *State* v. *Ross*, 230 Conn. 183, 213, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

The state maintains that, because intoxication is a mental status, the foregoing precedent establishes that

an accused, who, like the defendant, places that status in issue, will be deemed to have impliedly waived his right to invoke the psychiatrist-patient privilege vis-á-vis communications concerning his use of intoxicating drugs. In each of the cases on which the state relies, however, the issue before the court was whether the accused's constitutional right against self-incrimination was violated by a court order requiring the accused to submit to a psychiatric examination.[20] See *State* v. *Steiger*, supra, 218 Conn. 362; *State* v. *Manfredi*, 213 Conn. 500, 512, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990); *State* v. *Lovelace*, 191 Conn. 545, 550, 469 A.2d 391 (1983), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984). Thus, these cases address the waiver issue in the context of the interplay between the fifth and fourteenth amendment rights of a defendant who has asserted a defense predicated upon his mental status, on the one hand, and the state's legitimate interest in subjecting such a defendant to a compulsory psychiatric examination, on the other. We consistently have held that a defendant waives his right not to be subject to a compulsory psychiatric examination when he places his mental status in issue by asserting the defenses of mental disease or defect[21] or extreme emotional disturbance.[22] E.g., *State* v. *Manfredi*, supra, 513. This line of cases, however, does not concern the implied waiver of a

---

[20] We note that, in *State* v. *Ross*, supra, 230 Conn. 183, the defendant, Michael B. Ross, claimed that the trial court's instruction to the jury that it could draw an adverse inference from his failure to call as witnesses two psychiatrists with whom he had consulted "was fundamentally inconsistent with his privilege to consult psychiatric experts in furtherance of his insanity defense." Id., 210. We did not reach the merits of Ross' claim but, rather, held that the instruction, even if improper, was harmless. Id., 215. Accordingly, *Ross* provides no support for the state's argument that the defendant's claim of intoxication constituted an implied waiver of his right to invoke the psychiatrist-patient privilege.

[21] See General Statutes § 53a-13.

[22] See General Statutes § 53a-54a (a).

defendant's psychiatrist-patient privilege. Because the statutory scheme carves out no exception for implied waivers of the psychiatrist-patient privilege in criminal cases, we reject the state's contention that the defendant, in claiming that he was intoxicated when he had caused the victim's death, impliedly waived his right to invoke that privilege to shield his mental health records from disclosure.

## II

The state next claims that any improper disclosure of the defendant's privileged records does not warrant reversal of his conviction for intentional manslaughter unless the defendant can demonstrate harm resulting from the impropriety. The state also claims that the defendant cannot establish any such harm. The defendant maintains that the Appellate Court properly determined that a violation of the privilege is not subject to harmless error analysis and, therefore, that he is entitled to a new trial without any showing of harm. The defendant further contends that, even if the violation is subject to harmless error review, the impropriety was of constitutional magnitude and, consequently, his conviction must be reversed unless the state can establish that the violation of the privilege was harmless beyond a reasonable doubt, a standard that the defendant contends the state cannot meet. We agree with the state that the improper disclosure of the defendant's mental health records is subject to harmless error analysis, that the defendant bears the burden of demonstrating harm and that the defendant cannot satisfy that burden.

It is well settled that most improprieties, even those of constitutional magnitude, can be harmless and, therefore, do not require the reversal of a defendant's conviction. See, e.g., *State* v. *Anderson*, 255 Conn. 425, 444, 773 A.2d 287 (2001); *State* v. *Williams*, 231 Conn. 235, 243 n.11, 645 A.2d 999 (1994). "[T]he appellate harmless

error doctrine is rooted in that fundamental purpose of our criminal justice system—to convict the guilty and acquit the innocent. The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (Citation omitted; internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 460, 610 A.2d 598 (1992). Accordingly, we forgo harmless error analysis only in rare instances involving a structural defect of constitutional magnitude. See *State* v. *Anderson*, supra, 444–45. "Structural defect cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . *Arizona* v. *Fulminante*, [499 U.S. 279, 309–10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)]. These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. [Id., 310]. Such errors infect the entire trial process, *Brecht* v. *Abrahamson*, [507 U.S. 619, 630, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)], and necessarily render a trial fundamentally unfair, [*Rose* v. *Clark*, 478 U.S. 570, 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)]. Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for [the] determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair. . . . *Neder* v. *United States*, [527 U.S. 1, 8–9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)]." (Internal quotation marks omitted.) *State* v. *Anderson*, supra, 445. The improper disclosure of a defendant's psychiatric records is not a structural defect affecting the very framework of the trial. We therefore disagree with the

Appellate Court that that impropriety is not subject to harmless error analysis.[23]

We next must decide whether the breach of the privilege rises to the level of a constitutional violation. "Our

---

[23] In reaching its contrary conclusion, the Appellate Court relied primarily on *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987). See *State* v. *Jenkins*, supra, 73 Conn. App. 168–71. In *Boscarino*, the trial court allowed the state to cross-examine the defendant, James Boscarino, with a statement that he had made in the course of a court-ordered psychiatric examination. *State* v. *Boscarino*, supra, 734. In particular, Boscarino, who had been charged with committing several sexual assaults, testified that he was at home when one of the assaults allegedly had occurred. See id., 735. During the court-ordered psychiatric examination, however, Boscarino had given a later time for his return home on that date. Id. The trial court ordered the examination; id.; pursuant to what is now Practice Book § 40-19, which prohibits the admission of any statement made by a defendant during a court-ordered psychiatric examination on the issue of the defendant's guilt. On appeal, Boscarino argued that the state's use of his statement violated that Practice Book provision because the statement bore directly on the issue of his guilt. Id., 736. The state contended that the statement related only to Boscarino's credibility and, therefore, the admission of that statement at Boscarino's criminal trial did not violate what is now Practice Book § 40-19. Id. We rejected the state's contention and concluded that the admission of Boscarino's statement was improper. Id., 736, 737. We did not thereafter explicitly decide whether the impropriety had resulted in harm to Boscarino. See generally id., 737.

The Appellate Court interpreted *Boscarino* as standing for the proposition that the state's improper use of a defendant's statement, made during a court-ordered psychiatric examination, requires a new trial regardless of the effect of the impropriety on the fairness of the trial. See *State* v. *Jenkins*, supra, 73 Conn. App. 168–70. The Appellate Court also indicated that the improper admission of the statement in *Boscarino* was analogous to the state's improper use of the privileged mental health records in the present case. See id., 169–70. In *Boscarino*, however, we reversed the defendant's convictions and ordered a new trial on other grounds, namely, because the trial court improperly had consolidated for purposes of trial four separate cases that were then pending against Boscarino. See *State* v. *Boscarino*, supra, 204 Conn. 718–19. Accordingly, it was not necessary for this court to determine whether the improper use of Boscarino's statement itself warranted reversal of Boscarino's convictions. See id. *Boscarino*, therefore, does not stand for the proposition that the state's improper use of a statement made by a defendant during a court-ordered psychiatric examination automatically requires reversal of the defendant's convictions irrespective of whether the impropriety resulted in harm to the defendant. Accordingly, even if the state's improper use of the defendant's privileged mental health records is analogous to the improper admission of Boscarino's statement,

standard of review of an evidentiary ruling is dependent on whether the claim is of constitutional magnitude. If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Otherwise, in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted.) *State* v. *Kirsch*, 263 Conn. 390, 412, 820 A.2d 236 (2003). The defendant contends that the improper disclosure of his mental health records and the state's subsequent use, for impeachment purposes, of the privileged information relating to his heroin use violated his constitutional rights to testify and to present a defense and, therefore, that the state bears the burden of establishing that the violation was harmless beyond a reasonable doubt. We disagree.

The United States constitution affords criminal defendants the right to testify and the right to present a defense. E.g., *Rock* v. *Arkansas*, 483 U.S. 44, 51–53, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (criminal defendant's right to testify guaranteed under fifth, sixth and fourteenth amendments to federal constitution); *Crane* v. *Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (right to present defense rooted in compulsory process and confrontation clauses of sixth amendment and due process clause of fourteenth amendment). The defendant has not demonstrated, however, how those rights were violated by the improper disclosure of his mental health records. The defendant was neither deprived of his right to testify nor prohibited from presenting his version of the facts. See *Ohler* v. *United States*, 529 U.S. 753, 759, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (2000) (defendant's right to testify is not violated when defendant is not prevented

---

*Boscarino* does not support the remedy of automatic reversal imposed by the Appellate Court in the present case.

"from taking the stand and presenting any admissible testimony she chooses"). In fact, the defendant did testify and did present his account of what he had told the nurse about his habitual heroin consumption.

We recognize, of course, that "a violation of constitutional magnitude may be established even though there has not been a complete abridgement or deprivation of the right. A constitutional violation may result, therefore, when a constitutional right has been impermissibly burdened or impaired by virtue of state action that unnecessarily chills or penalizes the free exercise of the right." (Internal quotation marks omitted.) *State* v. *Heredia*, 253 Conn. 543, 551, 754 A.2d 114 (2000). We do not discern any impermissible burdening of the defendant's right to testify or to present a defense as a result of the improper disclosure and use of his mental health records, however. The information in the defendant's mental health records that the state used for impeachment purposes was limited to one statement, and that statement bore little, if any, relevance to the issue for which it was used, namely, to rebut the defendant's contention that he was intoxicated when he engaged in the conduct that resulted in the victim's death.[24] Thus, the defendant would have us place a constitutional label on what is not an error of constitutional proportion. "[I]t would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Dash*, 242 Conn. 143, 152, 698 A.2d 297 (1997). Thus, we conclude that the

---

[24] As we discuss more fully hereinafter, the defendant's claim of intoxication was predicated on his mental condition when he engaged in the conduct that resulted in the victim's death, whereas his privileged statement regarding the extent of his drug habit pertained to his use of drugs generally rather than on the day of the victim's death specifically.

improper disclosure of the defendant's mental health records was not a violation of constitutional magnitude and, therefore, the defendant bears the burden of demonstrating that the error was harmful.

"As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 667, 835 A.2d 895 (2003). Applying either formulation of this test, we conclude that the defendant has failed to carry his burden of demonstrating that the disclosure of his mental health records was harmful.

The only portion of the improperly disclosed records that possibly could have prejudiced the defendant was the notation on the nursing assessment indicating that the defendant had reported a two or three bag per day heroin habit rather than the twenty to thirty bag per day heroin habit that the defendant asserted he had in his statement to the police and in his trial testimony. The notation, however, was not particularly relevant to the defendant's claim that, due to intoxication, he lacked the intent to commit the crimes with which he had been charged, because the amount of heroin he used generally or habitually was not directly probative of the amount of heroin he used leading up to the commission of the crimes.[25] Arguably, however, the

---

[25] Indeed, the Appellate Court also recognized the limited value of that information in regard to the defendant's intoxication claim. As the Appellate Court stated: "The defense in this case was not that the defendant had a particular drug *habit* relating to the average quantum of drugs used over the years, but his drug *use* on the morning and afternoon of the day on which the victim died. The record related to whether he had a two to three bag a day heroin habit or a two to three bundle a day heroin habit, and was

information that the state used in violation of the defendant's psychiatrist-patient privilege did reflect negatively on the defendant's credibility generally.

The impeachment value of the information contained in the nursing assessment was seriously undermined, however, by the defendant's explanation that the nursing assessment contained a mistake. According to the defendant, he told the nurse that he used two to three *bundles* of heroin per day, not two or three *bags* of heroin per day. This explanation was consistent with the defendant's statement to the police—which the state introduced into evidence in its case-in-chief—in which the defendant stated that he used two to three bundles of heroin per day and that a bundle consisted of ten bags. Furthermore, on redirect examination, the defendant was shown a questionnaire prepared the same day as the nursing assessment. That form contained a notation indicating that the defendant had a habit of consuming thirty bags of heroin per day. In light of the defendant's highly plausible explanation for the discrepancy between his trial testimony and the notation in the nursing assessment, and in view of the other strong indicia that the nursing assessment form notation was the product of a misunderstanding about the extent of the defendant's heroin use, in particular, the defendant's statement to the police and the notation in the questionnaire, it is highly unlikely that the improperly admitted evidence was materially prejudicial to the defendant.[26]

---

not directly related to the amount of heroin consumption on the day of the victim's death. Thus, the privileged record may not even have been relevant to the defendant's claim that he was intoxicated at the time of the victim's death." (Emphasis in original.) *State* v. *Jenkins*, supra, 73 Conn. App. 170.

[26] Moreover, it was undisputed that the defendant's urine tested positive for both cocaine and opiates on the day of the victim's death. Furthermore, the defendant had opiates on his person when he took the victim to the community center where Pettiford was located. See footnote 8 of this opinion.

Finally, the state's case against the defendant with respect to the intentional manslaughter charge was overwhelming. The defendant admitted that he repeatedly had struck the twenty-three month old victim in the head with multiple objects. Medical testimony established that those blows were delivered with extreme force. Furthermore, the state adduced evidence demonstrating that the defendant's version of events did not match the physical evidence and that the defendant likely destroyed some physical evidence before summoning help for the victim. Finally, the defendant himself admitted in his written statement to the police that, "I sniffed 2 to 3 bundles of heroin a day *but I know what I was doing when I sniffed the heroin.*" (Emphasis added.) Thus, we conclude that there is no reasonable likelihood that the state's use of the defendant's improperly disclosed mental health records resulted in harm to the defendant.

The judgment of the Appellate Court is reversed in part and the case is remanded to that court for consideration of the defendant's remaining claim.

In this opinion the other justices concurred.