******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FREEDOM OF INFORMATION OFFICER,
DEPARTMENT OF MENTAL HEALTH
AND ADDICTION SERVICES,
ET AL. *v.* FREEDOM
OF INFORMATION
COMMISSION
ET AL.
(SC 19371)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued January 14—officially released September 22, 2015*

*Valicia Dee Harmon*, commission counsel, with whom, on the brief, was *Colleen M. Murphy*, executive director and general counsel, for the appellant-appellee (named defendant).

*Jacqueline Hoell*, assistant attorney general, with whom were *Henry A. Salton*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellees-appellants (plaintiffs).

*Opinion*

EVELEIGH, J. The present case arises from the ruling of the named defendant, the Freedom of Information Commission (commission), that the defendant Ron Robillard was entitled to the disclosure of documents in the possession of the plaintiffs, the Department of Mental Health and Addiction Services (department) and its Freedom of Information Officer (information officer), under the Freedom of Information Act (act), General Statutes § 1-200 et seq. The commission appeals from the judgment of the trial court, claiming, inter alia, that the plaintiffs lacked standing to appeal to the trial court from the commission's decision. The plaintiffs cross appealed from the judgment of the trial court, claiming, inter alia, that the trial court improperly rejected the plaintiffs' claim that the documents were medical records related to the diagnosis and treatment of a patient and were, thus, psychiatric records exempt from disclosure pursuant to General Statutes § 52-146e. We conclude that the plaintiffs had standing to appeal the decision of the commission, and further agree with the plaintiffs that the documents at issue are exempt from disclosure under § 52-146e. Accordingly, we reverse the judgment of the trial court and remand the case to that court with direction to sustain the plaintiffs' appeal.

The following facts and procedural history are relevant to the present appeal. The plaintiffs received a request under the act from Robillard for any records concerning a person named Amy Archer Gilligan for the period of time from 1924 through 1962. Gilligan was a patient at a facility now known as Connecticut Valley Hospital (hospital) following her conviction for second degree murder for the arsenic poisoning of a resident of her nursing home. Gilligan's life is widely considered to be the basis for the play and movie entitled "Arsenic and Old Lace." The plaintiffs provided Robillard with copies of those records pertaining to Gilligan that it deemed were disclosable under the act. Robillard was notified by the plaintiffs that other records, deemed exempt from disclosure under the act, were withheld.

Robillard then filed a complaint with the commission alleging that the plaintiffs violated the act by failing to provide these records concerning the confinement of Gilligan. After a full hearing and an in camera inspection of the records before a hearing officer of the commission, the commission adopted the proposed findings and decision of the hearing officer. In its memorandum of decision, the hearing commission found that some of the records submitted for in camera review were exempt from disclosure as psychiatric records under § 52-146e. The commission found that two documents submitted for in camera inspection were exempt from disclosure under General Statutes § 1-210 (b) (10) as "communications privileged by the attorney-client rela-

tionship . . . ." The commission found that the rest of the records submitted for in camera review did not qualify as psychiatric records or attorney client communications, but were "on their face medical records . . . ." The commission found that the medical records were not exempt from disclosure under the federal Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d et seq. The commission further found that the medical records were not exempt from disclosure under the act because Gilligan is deceased and, therefore, there can be no invasion of privacy under § 1-210 (b) (2).

The plaintiffs then filed an administrative appeal pursuant to General Statutes § 4-183 of the Uniform Administrative Procedure Act (UAPA). On appeal to the trial court, the plaintiffs made the following claims: "(1) The [commission] erroneously applied Connecticut's psychiatric-patient privilege by allowing disclosure of certain of the documents requested by Robillard, (2) the [commission] erroneously applied the § 1-210 (b) (2) exemption from disclosure under the [act], and (3) the [commission] erroneously interpreted the department's claimed exemption under HIPAA." The trial court found that the commission properly applied § 52-146e, with the exception of two documents that the court ordered partially redacted as to diagnosis. The trial court further found that the commission properly applied § 1-210 (b) (2), but found that the plaintiffs had met their burden under § 1-210 (b) (2) as to the physical and dental examination records contained in the documents, finding that they were not a legitimate matter of public concern and would be highly offensive if disclosed. Accordingly, the trial court sustained the plaintiffs' appeal as to those physical and dental examination records. The commission appealed and the plaintiffs cross appealed from that judgment to the Appellate Court, and we transferred those appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

On appeal to this court, the commission claims that the plaintiffs lacked standing to appeal to the trial court from the commission's decision that Gilligan's medical records were not exempt from disclosure. In the cross appeal, the plaintiffs claim that the trial court improperly concluded that all of the records at issue were not exempt from disclosure under § 52-146e.[1] We conclude that the plaintiffs had standing to appeal to the trial court from the commission's decision and that the trial court improperly concluded that all of the records at issue were not exempt from disclosure under § 52-146e.

I

The commission asserts that the plaintiffs lacked standing to appeal to the trial court from the commission's decision that Gilligan's medical records were not exempt from disclosure.[2] Specifically, the commission

asserts that the plaintiffs are not aggrieved because their personal privacy interest was not affected by its decision. Further, the commission claims that the plaintiffs lack standing because they cannot assert the privacy interests of their deceased client. In response, the plaintiffs assert that they had standing to appeal from the commission's decision that Gilligan's medical records were not exempt from disclosure under § 1-210 (b) (2) because they were aggrieved by the decision of the commission. We agree with the plaintiffs.

"As a preliminary matter, we address the appropriate standard of review. If a party is found to lack [aggrievement], the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"Subject matter jurisdiction [implicates] the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of want of jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *New London*, 282 Conn. 791, 802, 925 A.2d 292 (2007).

"Only parties aggrieved by the decision of the [commission] have standing to take appeals to the Superior Court. General Statutes § 1-21i (d). Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of [a] direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy.

"As long as there is some direct injury for which the plaintiff seeks redress, the injury that is alleged need not be great . . . [and] need not be primarily economic. . . .

"In appeals pursuant to § 1-21i (d), we have translated these general principles into a twofold test for aggrievement that requires a showing of: (1) a specific personal and legal interest in the subject matter of the [commission] decision; and (2) a special and injurious effect on this specific interest." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Board of Pardons* v. *Freedom of Information Commission*, 210 Conn. 646, 648–49, 556 A.2d 1020 (1989).

Although the commission does not expressly address why the plaintiffs are not aggrieved, it seems to assert that because they are merely the holder of the public records at issue here, they are not affected by any disclosure and are not the appropriate parties to provide evidence as to why disclosure would constitute an invasion of privacy. In response, the plaintiffs assert that they are aggrieved by the commission's decision because they have a legally protected interest that has been, and will in the future be, adversely affected by the commission's decision. Specifically, the plaintiffs assert that the department is statutorily charged with providing comprehensive, client based services in the areas of mental health and substance abuse treatment to people in the state, including many people who have been found not guilty of crimes but are in need of psychiatric care and others who may be characterized as notorious. The plaintiffs further assert that the department's interest in providing such care is adversely affected by the commission's determination that medical records of patients in their facilities can be subject to disclosure under the act because it might adversely affect patients' willingness to provide information regarding their medical history and status if such information is subject to disclosure.

In support of their position, the plaintiffs rely on *Board of Pardons* v. *Freedom of Information Commission*, supra, 210 Conn. 646. In *Board of Pardons*, the commission had issued a decision finding that the Board of Pardons (board) had improperly gone into executive session to discuss records of prisoners. The board appealed the decision to the trial court and then to the Appellate Court. The Appellate Court concluded that the board did not have standing to appeal from the decision of the commission because it was not aggrieved. See id., 648. This court reversed the judgment of the Appellate Court, concluding that "the board has a legitimate institutional interest in the integrity of its decision-making process. The board has advanced a colorable claim of injury to its own deliberative functions that transcends the interests of individual prisoners in the disclosure of their records. In deciding whether to grant a pardon or to commute a prison sentence, the board depends not simply on objective [fact-finding], but also on purely subjective evaluations and on predictions of future behavior . . . . In order

to carry out this sensitive mission, the board claims that it needs the opportunity for confidential dialogue about every aspect of a prisoner's record. The board alleges that, as a practical matter, there is a great deal of overlap between the discussion of the records of individual prisoners, which the [commission] has ordered to be held in public, and the discussion of third party information, which even the [commission] has permitted to be conducted in executive session. The bifurcated procedure that the [commission] order mandates therefore gave rise to a colorable claim of injury to a central aspect of the board's functions." (Citation omitted; internal quotation marks omitted.) Id., 650–51. This court further concluded that the commission's decision "would undoubtedly have . . . a chilling effect on the [board] the next time it contemplated . . . an executive session in order to decide whether to grant a petition for a pardon." (Internal quotation marks omitted.) Id., 651. Similarly, we conclude that the plaintiffs have made a colorable claim that the commission's decision in the present case would have a chilling effect on its statutorily mandated role of providing mental health and addiction services to patients in the state of Connecticut.

In *Board of Pardons*, this court also relied on the fact that the potential for criminal liability or civil incarceration was sufficient to confer standing. "Because the [act] makes noncompliance with [a commission] order a class B misdemeanor; General Statutes § 1-21k (b); the individual members of the board have a 'specific and personal' interest in the validity of such an order. In the future, board members face the risk of injury, in the form of criminal prosecution and sanctions, if they fail to comply with the present [commission] order. Such a risk of prosecution establishes the requisite 'specific and personal interest' of the members of the board and of the board itself as their representative." (Footnote omitted.) *Board of Pardons* v. *Freedom of Information Commission*, supra, 210 Conn. 650.[3] In the present case, based on the commission's ruling, employees of the department may face criminal liability or civil incarceration in the future if they do not disclose records. Such potential is sufficient to present a colorable claim of direct injury.

Moreover, the plaintiffs are subject to General Statutes § 52-146j,[4] which provides a cause of action for improper disclosure of psychiatric records. The potential for a civil action and penalties for improper disclosure of such actions is further evidence that the plaintiffs have a colorable claim of direct injury related to the commission's decision.[5]

Accordingly, we conclude that the plaintiffs had standing to appeal from the decision of the commission.

II

In their cross appeal, the plaintiffs assert that the trial court improperly affirmed the decision of the commission finding that some of the records at issue were not exempt from disclosure under § 52-146e.[6] Specifically, the plaintiffs assert that the commission and the trial court improperly divided the records at issue between documents that were related to psychiatric care and those that were medical records. The plaintiffs assert that such a division was improper because all of the documents at issue were created during care for a patient at an inpatient mental health facility, and that medical diagnosis and treatment are part of psychiatric treatment and diagnosis at an inpatient mental health facility. In response, the commission asserts that the commission and the trial court properly determined that the medical and dental records are not exempt from disclosure under § 52-146e because they are not privileged communications and records as defined by General Statutes § 52-146d (2).[7] We agree with the plaintiffs and, accordingly, reverse the judgment of the trial court to the extent that it determined that the medical records were not exempt from disclosure under § 52-146e.

"This court reviews the trial court's judgment pursuant to the . . . UAPA . . . . Under the UAPA, it is [not] the function . . . of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Even for conclusions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse if its discretion. . . . [Thus] [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . [Similarly], this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Citation omitted; internal quotation marks omitted.) *Chairperson, Connecticut Medical Examining Board* v. *Freedom of Information Commission*, 310 Conn. 276, 281–82, 77 A.3d 121 (2013). Even if time-tested, we

will defer to an agency's interpretation of a statute only if it is "reasonable"; that reasonableness is determined by "[application of] our established rules of statutory construction." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *State Board of Labor Relations*, 296 Conn. 594, 599, 996 A.2d 729 (2010).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Chairperson, Connecticut Medical Examining Board* v. *Freedom of Information Commission*, supra, 310 Conn. 283. The issue of statutory interpretation presented in this case is a question of law subject to plenary review. See id., 282–83.

We begin with the text of the statute. Section 52-146e (a) provides as follows: "All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative." The plain language of § 52-146e exempts all such "communications and records" from disclosure.

Therefore, we must consider whether medical and dental records are "communications and records" for the purposes of § 52-146e. Section 52-146d (2) defines " '[c]ommunications and records' " as "all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records

which occur in or are prepared at a mental health facility . . . ."

In the present case, the crux of the disagreement between the commission and the plaintiffs is whether medical and dental records contained within Gilligan's file are exempt from disclosure under § 52-146e. The commission asserts, and the trial court agreed, that these documents were not exempt from disclosure because they were not "oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist . . . ." General Statutes § 52-146d (2). We agree that the medical and dental records are not communications directly between Gilligan and a psychiatrist or between a member of Gilligan's family and a psychiatrist.

Nevertheless, the definition of " '[c]ommunications and records' " in § 52-146d (2) does not stop there. Section 52-146d (2) further defines " '[c]ommunications and records' " to include "all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition . . . between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

In interpreting this statute, we do not write on a clean slate. "As we have previously observed, [t]he people of this state enjoy a broad privilege in the confidentiality of their psychiatric communications and records . . . and the principal purpose of that privilege is to give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment free from the embarrassment and invasion of privacy which could result from a doctor's testimony. . . . Accordingly, the exceptions to the general rule of nondisclosure of communications between psychiatrist and patient were drafted narrowly to ensure that the confidentiality of such communications would be protected unless important countervailing considerations required their disclosure. . . .

"Although we are cognizant that [c]ommunications that bear no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are admissible subject to the normal rules of evidence . . . we are equally convinced that the protection of communications that identify a patient are central to the purpose of the statute. The language of the statute supports this conclusion. Section 52-146e (a) specifically prohibits the disclosure or transmission of any communications or records that would identify a patient . . . . Section 52-146d provides that the

phrase identify a patient refer[s] to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records . . . . Further, the fact that an explicit exception contained in subdivision (3) of [General Statutes] § 52-146f permits the disclosure of a patient's name, address and . . . [t]hat the person was in fact a patient for purposes of collection disputes between the hospital and the patient, lends weight to our conclusion that the general rule against disclosure applies with equal force to identity as to other information." (Citations omitted; internal quotation marks omitted.) *Falco* v. *Institute of Living*, 254 Conn. 321, 328–29, 757 A.2d 571 (2000).

In *State* v. *Jenkins*, 73 Conn. App. 150, 162, 807 A.2d 485 (2002), rev'd in part on other grounds, 271 Conn. 165, 856 A.2d 383 (2004), the Appellate Court considered whether a nursing assessment is a mental health record as defined in § 52-146d. The Appellate Court recognized that "[t]he purpose of the privilege is 'to protect a therapeutic relationship. The statute provides a privilege for confidential communications so that a patient may safely disclose to his therapist personal information that is necessary for effective treatment or diagnosis.' *Bieluch* v. *Bieluch*, 190 Conn. 813, 819, 462 A.2d 1060 (1983) . . . ." (Citation omitted.) *State* v. *Jenkins*, supra, 162.

The Appellate Court concluded that the nursing assessment is a mental health record as defined in § 52-146d, relying on the document itself that indicated that the defendant authorized diagnosis and treatment of a mental condition and testimony from the director of the facility that the nursing assessment was conducted under the supervision of a psychiatrist, and that all the information, even the biographical data, is used to "gather information about mental health issues . . . ." (Internal quotation marks omitted.) Id.

Similar to the evidence in *Jenkins*, at the hearing before the commission, Thomas Pisano, a psychiatrist, testified that the medical and dental records at issue were created at the hospital during Gilligan's inpatient treatment. Pisano further testified that the records were created under the direction of a psychiatrist. Pisano also testified that the superintendent of the facility at the time Gilligan was a patient was a psychiatrist. The foregoing examination of the plain language of §§ 52-146d and 52-146e and prior interpretations support the conclusion that the medical and dental records of Gilligan are exempt from disclosure under § 52-146e.[8]

The plaintiffs assert that related statutory provisions also support the conclusion that Gilligan's medical and dental records are exempt from disclosure under § 52-

146e. Specifically, the plaintiffs assert that General Statutes § 17a-545[9] supports its position. Section 17a-545 requires inpatient mental health facilities to conduct a physical examination of every patient and to make those reports part of the patient's clinical record. We agree with the plaintiffs that the legislature's decision to require physical examinations of all patients at inpatient mental health facilities supports our conclusion that such physical examinations and the resulting medical record are part of the patient's mental health record and not subject to disclosure. Furthermore, the legislature's decision to require physical examinations of patients at inpatient mental health facilities also indicates that the legislature understood that mental health conditions are often related to physical disorders and that the proper treatment of mental health involves the treatment of physical issues, as well.

Our construction of §§ 52-146d and 52-146e is also consistent with the broad language of the psychiatrist-patient privilege. As "[t]his court previously has explained . . . § 52-146e spreads a veil of secrecy over communications and records relating to the diagnosis or treatment of a patient's mental condition. With certain exceptions not pertinent to the present discussion, the statute provides that no person may disclose or transmit any communications and records . . . to any person, corporation or governmental agency without the consent of the patient or his authorized representative. [General Statutes § 52-146e (a)]. The broad sweep of the statute covers not only disclosure to a defendant or his counsel, but also disclosure to a court even for the limited purpose of an in camera examination." (Internal quotation marks omitted.) *State* v. *Kemah*, 289 Conn. 411, 424, 957 A.2d 852 (2008). Accordingly, our understanding of the broad veil of secrecy created by the psychiatrist-patient privilege also supports our conclusion that medical and dental records that are created by an inpatient mental health facility during the treatment of a patient are exempt from disclosure under § 52-146e.

On the basis of the relevant statutory language, related statutory provisions and prior interpretations of the act, we conclude that the trial court improperly affirmed the commission's determination that Gilligan's medical and dental records were not exempt from disclosure under § 52-146e.

The judgment is reversed and the case is remanded to the trial court with direction to sustain the plaintiffs' appeal.

In this opinion ROGERS, C. J., and ZARELLA, ESPINOSA and ROBINSON, Js., concurred.

[1] In its appeal, the commission also asserts that the trial court improperly: (1) substituted its own judgment for that of the commission when it determined that disclosure of the records related to Gilligan's physical and dental examinations would constitute an invasion of privacy under § 1-210 (b) (2); (2) found that records related to Gilligan's physical and dental examinations

were exempt from disclosure under § 1-210 (b) (2) when Gilligan was an infamous arsenic murderess; (3) found that under § 1-210 (b) (2) disclosure of the records related to Gilligan's physical and dental examinations would be highly offensive to a reasonable person when Gilligan has been deceased since 1962 and is not survived by any relative; (4) found that records related to Gilligan's physical and dental examinations were exempt from disclosure under § 1-210 (b) (2) when Gilligan's privacy rights terminated upon her death; (5) found that records related to Gilligan's physical and dental examinations were exempt from disclosure under § 1-210 (b) (2) as protecting the privacy rights of Gilligan's living relatives when Connecticut has yet to recognize survivor privacy right and, alternatively, even if such rights were recognized, they would not be applicable here because there is no evidence that Gilligan is survived by a relative and the records at issue do not involve gruesome images of her death. The plaintiffs also assert in their cross appeal that the trial court improperly concluded that some of Gilligan's medical records were not exempt from disclosure under § 1-210 (b) (2). Because we conclude that all of Gilligan's medical records are exempt from disclosure under § 52-146e, we need not reach these other claims.

[2] It is not entirely clear from the commission's brief whether it challenges the plaintiffs' standing to appeal under both §§ 1-210 (b) (2) and 52-146e. To the extent that the commission challenges the plaintiffs' standing under both statutes and because standing is a jurisdictional question, we address the commission's claim as a threshold issue. The concurring and dissenting opinion asserts that "I do not understand why the majority has analyzed the department's standing in its opinion. . . . Nevertheless, I agree with the majority's conclusion that the department has standing to raise this exemption." See footnote 2 of the concurring and dissenting opinion. The concurring and dissenting opinion further asserts that "the commission concedes that the department has standing to raise" the psychiatric records privilege. Id. We disagree. From our review of the parties' briefs, we do not conclude that the commission concedes that the department has standing in this appeal. Accordingly, out of an abundance of caution, we address the standing issue.

[3] In the present case, it is unclear whether the commission asserts that the information officer of the department also lacks standing to appeal from the decision of the commission. As the individual tasked with making sure that the department complies with the act, the information officer faces risk of prosecution for failure to follow an order of the commission. Therefore, to the extent that the commission asserts that the information officer does not have standing to appeal from its decision, we conclude that "[s]uch a risk of prosecution establishes the requisite specific and personal interest . . . ." (Internal quotation marks omitted.) *Board of Pardons* v. *Freedom of Information Commission*, supra, 210 Conn. 650.

[4] General Statutes § 52-146j provides: "(a) Any person aggrieved by a violation of sections 52-146d to 52-146j, inclusive, may petition the superior court for the judicial district in which he resides, or, in the case of a nonresident of the state, the superior court for the judicial district of Hartford, for appropriate relief, including temporary and permanent injunctions, and the petition shall be privileged with respect to assignment for trial.

"(b) Any person aggrieved by a violation of sections 52-146d to 52-146j, inclusive, may prove a cause of action for civil damages."

[5] In support of its claim, the commission cites to *Chairman, Board of Education* v. *Freedom of Information Commission*, 60 Conn. App. 584, 760 A.2d 354 (2000) (disclosure of employee's personnel or medical files), *Superintendent of Police* v. *Freedom of Information Commission*, 222 Conn. 621, 629–30, 609 A.2d 998 (1992) (disclosure of pistol permits), and *West Hartford* v. *Freedom of Information Commission*, 218 Conn. 256, 264–65, 588 A.2d 1368 (1991) (disclosure of addresses of retired employees). We find these cases to be inapposite to the present case.

[6] General Statutes § 52-146e provides: "(a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. Each patient shall be informed that his refusal to grant consent will not jeopardize his right to obtain present or future treatment except where disclosure of the communications and records is necessary for the treatment.

"(c) The patient or his authorized representative may withdraw any consent given under the provisions of this section at any time in a writing addressed to the person or office in which the original consent was filed. Withdrawal of consent shall not affect communications or records disclosed prior to notice of the withdrawal."

[7] General Statutes § 52-146d provides in relevant part: "(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

[8] The interpretation of §§ 52-146d and 52-146e proffered in the concurring and dissenting opinion is contrary to this court's well established interpretation of this statute. The interpretation unnecessarily restricts the protections afforded to psychiatric records of individuals who seek mental health treatment in this state in favor of "this state's abiding commitment to 'the open conduct of government and free public access to government records.' *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 328, 435 A.2d 353 (1980) . . . ." (Citations omitted.) The concurring and dissenting opinion fails to acknowledge, however, that its very strict interpretation of §§ 52-146d and 52-146e, which is completely unsupported by any case law, serves to threaten the "broad privilege in the confidentiality of their psychiatric communications and records" that the citizens of this state have long enjoyed in all circumstances, not just those involving requests under the act. (Internal quotation marks omitted.) *Falco* v. *Institute of Living*, supra, 254 Conn. 328. Indeed, the interpretation posed in the concurring and dissenting opinion in the present case would serve to discourage individuals from seeking mental health treatment for fear that information contained in records prepared by mental health and other medical providers would not remain confidential, but could be disclosed without the patient's consent. We refuse to interpret the psychiatrist-patient privilege in such a manner so as to thwart mental health treatment in this state at a time when society is seeing the ever increasing need for individuals to seek out and receive mental health treatment.

This court has repeatedly recognized that "[t]he privilege covers not only communications between the patient and psychiatrist, but also all communications relating to the patient's mental condition between the patient's family and the psychiatrist and his staff and employees, as well as records and communications prepared at mental health facilities." (Internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988). "Our statutory scheme prohibits the disclosure of any covered records or communications without the written consent of the patient or his authorized representative." *State* v. *Jenkins*, 271 Conn. 165, 180–81, 856 A.2d 383 (2004).

Contrary to this well established interpretation, and without any citation to authority, the concurring and dissenting opinion would have us remand the case for further findings as to whether the medical and dental records were prepared as part of Gilligan's mental health treatment. A remand in this matter is unnecessary. The plaintiffs have already presented testimony that the records at issue are "the psychiatric and medical records of [the hospital] of . . . Gilligan." The plaintiffs' witness further testified that the records were created under the direction of a psychiatrist, were prepared at the hospital and that the hospital was considered a mental health facility for the treatment and diagnosis of mental illness at the time the communications occurred. Furthermore, as the concurring and dissenting opinion acknowledges, "[i]f the documents themselves demonstrate that the privilege applies, a proponent can meet this burden simply by offering the documents for in camera inspection by the commission's hearing officer . . . ." Not only is such a task nearly impossible for records that were created at a mental health facility approximately fifty to ninety years ago, but such distinctions are inconsistent with the purpose of §§ 52-146d and 52-146e and our interpretation of those statutes. See, e.g., *State* v. *Jenkins*, supra, 271 Conn. 176 (nursing assessment prepared at mental health facility where patient was being treated covered under § 52-146d). Moreover, the approach adopted in the concurring and dissenting opinion is inconsistent with other courts that have addressed this issue. See, e.g., *Ex parte Western Mental Health Center*, 884 So. 2d 835, 840 (Ala. 2003) ("[i]t is not disputed that . . . medical records, created during the psychiatrist-patient relationship, are included in the confidential relationship and are also privileged" [internal quotation marks omitted]). Indeed, "[r]ecognizing the rule that hospital and medical records are generally within the physician-patient privilege, [courts in many jurisdictions have] allowed hospitals to assert the privilege on behalf of their patients." Annot., 10 A.L.R.4th 552, § 4 (1981). In the present case, the plaintiffs have satisfied their burden, through testimony and by virtue of the records themselves, that the documents fall within the protections of §§ 52-146d and 52-146e.

The disclosure at issue is not covered by any of the exceptions in § 52-146f. "It is just as clear that no exception is available beyond those contained in § 52-146f. . . . With respect to § 52-146e, we have noted that the legislature has narrowly drafted the exceptions to the general rule against disclosure after carefully balancing the important countervailing considerations." (Citation omitted.) *Falco* v. *Institute of Living*, supra, 254 Conn. 330.

Moreover, the concurring and dissenting opinion completely ignores the

fact that many of the records that it finds to be subject to disclosure identify the patient and include the patient's diagnosis. As stated previously in this opinion, in discussing the disclosure of identifying information contained within records of a mental health facility, this court has reasoned as follows: "Although we are cognizant that [c]ommunications that bear no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are admissible subject to the normal rules of evidence . . . we are equally convinced that the protection of communications that identify a patient are central to the purpose of the statute. The language of the statute supports this conclusion. Section 52-146e (a) specifically prohibits the disclosure or transmission of any communications or records that would identify a patient . . . . Section 52-146d provides that the phrase identify a patient refer[s] to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records . . . . Further, the fact that an explicit exception contained in subdivision (3) of § 52-146f permits the disclosure of a patient's name, address and . . . [t]hat the person was in fact a patient for purposes of collection disputes between the hospital and the patient, lends weight to our conclusion that the general rule against disclosure applies with equal force to identity as to other information." (Internal quotation marks omitted.) Id., 328–29.

"We also disagree . . . that identifying information is of lesser importance within the statutory scheme than other communications and records. The confidentiality of a patient's identity is as essential to the statutory purpose of preserving the therapeutic relationship as the confidentiality of any other information in a patient's communications and records. The statute recognizes the unfortunate reality that a stigma may attach to one who seeks psychiatric care, and that revealing a patient's identity may subject him or her to embarrassment, harassment or discrimination." Id., 329.

We are bound to apply this court's interpretation of §§ 52-146d and 52-146e in *Falco* v. *Institute of Living*, supra, 254 Conn. 329, which prohibits the disclosure of any documents from which a patient can be identified. None of the parties have asked us to overrule or modify our decision in that case. Furthermore, in the fifteen years since *Falco*, the legislature has not acted to amend §§ 52-146d and 52-146e in response to this court's interpretation. "Although we are aware that legislative inaction is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *Caciopoli* v. *Lebowitz*, 309 Conn. 62, 78, 68 A.3d 1150 (2013). By choosing not to legislatively overrule *Falco*, the legislature has acquiesced to this court's interpretation of §§ 52-146d and 52-146e. Indeed, one of the indicators of legislative acquiescence to our interpretation of a statute is the passage of "an appropriate interval [of time] to permit legislative reconsideration . . . without corrective legislative action . . . ." *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494–95, 923 A.2d 657 (2007).

The concurring and dissenting opinion relies on *State* v. *Montgomery*, 254 Conn. 694, 759 A.2d 995 (2000). In *Montgomery*, Elaine Janas, a mental health assistant at Cedarcrest Hospital, testified at a criminal trial regarding a telephone conversation she overheard between the defendant and a third party unconnected to the facility, while the defendant was a patient at the mental health facility in which she worked. Id., 722–23. The defendant appealed claiming that "because Janas was assigned by a psychiatrist to observe him and to record his behavior, anything that the defendant said within her earshot necessarily related to his diagnosis and treatment." Id., 723. This court rejected the defendant's claim and concluded that the trial court properly allowed Janas to testify "in the presence of the jury regarding the defendant's statement." Id. This court reasoned as follows: "As the trial court concluded, the communication at issue was not between the defendant and a psychiatrist or Janas, but, rather, between the defendant and an unknown third party located outside of the hospital. Moreover, the defendant's instruction to that third party not to 'forget [he] was with [the third party] last night' bore no relation to the defendant's diagnosis or treatment. The mere fact that Janas was assigned to observe the defendant for his own protection does not transform the defendant's statement into a protected communication under the psychiatrist-patient privilege. A contrary determination would extend that privilege well beyond the plain statutory language that defines it. Accordingly, we reject the defendant's claim that the trial court improperly permitted the state to elicit Janas' testimony regarding the defendant's statement." Id., 725.

A review of the opinion and the briefs in *Montgomery* demonstrates that the defendant never claimed that Janas' testimony violated §§ 52-146d and 52-146e because it revealed the defendant's identity as an individual who received treatment at the mental health facility. Indeed, although *Montgomery* was decided approximately two months after *Falco*, the court did not address *Falco* in *Montgomery*. The absence of such a reference indicates that this court did not consider *Montgomery* to raise an issue regarding disclosure of identifying information. We conclude that *Montgomery* is inapposite to the present case because it involved a communication by the patient to a third party, which is not an issue in the present case.

Moreover, the concurring and dissenting opinion misstates the factual and procedural background of *Montgomery*. Specifically, the concurring and dissenting opinion explains as follows: "[Janas] was permitted to testify about patient conversations that she overheard even though her testimony identified the defendant as a psychiatric inpatient. . . . [Janas] was allowed

to testify before the court, *initially outside the presence of the jury*, that the defendant was treated at the psychiatric hospital where she worked; that a psychiatrist had instructed her to monitor the defendant on a ' "one-to-one' " basis and take notes of his activities every fifteen minutes; and that such protocol was typical for suicidal patients. . . . The trial court allowed her testimony and she repeated much of this same information to the jury." (Citations omitted; emphasis added.) This is inaccurate. In *Montgomery*, this court explained as follows: "The defendant filed a motion in limine to preclude [Janas'] testimony . . . . The trial court conducted a hearing on the defendant's motion *outside the presence of the jury. At the hearing*, Janas testified that, pursuant to a psychiatrist's instructions, she was assigned to monitor the defendant on a 'one-to-one' basis on . . . the day after the homicide. Pursuant to those instructions, Janas was to remain within 'arm's length' of the defendant at all times and to take notes regarding the defendant's activities every fifteen minutes. Janas further testified that 'one-to-one' supervision is ordered for a patient's protection, usually when that patient is suicidal." (Emphasis added.) *State* v. *Montgomery*, surpa, 254 Conn. 722–23. In contrast, when describing Janas' trial testimony, this court only stated: "Janas . . . testified *in the presence of the jury* regarding the defendant's statement." (Emphasis added.) Id., 723. Therefore, unlike the representation in the concurring and dissenting opinion, nothing in this court's opinion in *Montgomery* explains to what extent, if any, Janas' testimony revealed the identity of the defendant in that case as a psychiatric inpatient. Accordingly, we are not persuaded that *Montgomery* is relevant to our analysis in the present case.

The concurring and dissenting opinion asserts that certain administrative documents should not be exempt from disclosure. We disagree. There are approximately four letters from the superintendent of the facility to Gilligan's daughter, which contain identifying information and responses to questions about her treatment. There is one letter from the superintendent to Metropolitan Life Insurance that details Gilligan's diagnosis, psychiatric treatment and mental state. We conclude that these correspondence are covered under §§ 52-146d and 52-146e because they contain identifying information and information related to Gilligan's diagnosis. See *Falco* v. *Institute of Living*, supra, 254 Conn. 322–23 (concluding that facility was not required to release "name, last known address and social security number" of former patient). The concurring and dissenting opinion asserts that the fact that Gilligan's commitment to the hospital is a matter of public record and that the department has already released numerous records indicating her commitment to the hospital are reason to disclose additional documents that identify her. We disagree. The issue before us is only whether these particular documents should be disclosed. We have not been asked to indicate whether the department's prior disclosures were proper and those disclosures are not, therefore, part of the present appeal. Consequently, we do not address those prior disclosures. We also conclude that interpreting the psychiatrist-patient privilege in light of what the public may or may not know about the person or his or her medical history is a dangerous proposition not authorized by statute. As this court stated in *Falco*, "it is contrary to the language of the statute and the intent of the legislature for courts to make discretionary case-by-case determinations of when the privilege may be overridden." Id., 331. This is precisely what the concurring and dissenting opinion is suggesting we should do in the present case. Thus, while the concurring and dissenting opinion may choose to criticize our approach as "heavy-handed" and "yield[ing] the detritus of a needless collision between two competing statutory mandates," which is "at odds with § 52-146e" and an "overbroad interpretation of the privilege," we are merely applying our established case law.

The concurring and dissenting opinion further asserts that Pisano testified that "certain documents were not psychiatric records, including the correspondence with Gilligan's daughter." (Emphasis omitted.) We disagree with this representation of the testimony. Pisano cataloged the documents in the file, but never offered an opinion as to whether all of the documents were or were not psychiatric records. The testimony was as follows:

"[Assistant Attorney General]: . . . [W]hen you reviewed the records, did you find any records that were not specifically psychiatric in nature?

"[Pisano]: Well, as stated, there was the newspaper clippings. There was the correspondence between the warden at the Connecticut State Prison in Wethersfield and the superintendent at [the hospital]. There was—

\* \* \*

"The Hearing Officer: The . . . original question was, as I heard it, were there records that were not psychiatric records?

\* \* \*

"[Pisano]: Okay. And there was . . . the correspondence by the state's attorney. There was the news clippings, the Metropolitan Life Insurance. There was correspondence between the superintendent and . . . the patient's daughter."

We disagree with the concurring and dissenting opinion's assertion that the plaintiffs' witness testified that the correspondence between the superintendent and the patient's daughter was not a psychiatric record. Even if the witness had offered his opinion as to whether they were psychiatric records, a determination of whether the records at issue fall within the protection of §§ 52-146d and 52-146e is a legal determination, not a factual one. Moreover, the plaintiffs disclosed many of the documents listed by the witness, including many communications from Metropolitan Life Insurance to the hospital, the correspondence from the state's attorney, the correspondence between the warden and the superintendent, and the newspaper clippings.

[9] General Statutes § 17a-545 provides: "Every patient hospitalized under any of sections 17a-540 to 17a-550, inclusive, shall receive a physical examina-

tion within five days of his hospitalization, and at least once each year thereafter. Every patient shall be examined by a psychiatrist within forty-eight hours of his hospitalization, and at least once each six months thereafter. Reports of all physical and psychiatric examinations shall be completed and signed by the examining physicians and made a part of the patient's permanent clinical record."